## O. D. CANNON v. THE STATE.

No. 1969. Decided February 14, 1900.

Motion for Rehearing Decided March 23, 1900.

**1. Statement of Facts—Filing of—Diligence.**

Where, on the 12th day of August, the court allowed ten days for the filing of the statement of facts, and owing to the voluminous evidence a great deal of time was required to prepare the same; and defendant's attorneys after preparing it confided it for transmission, a distance of fifty miles by railroad, to an express company on the morning of the 21st of August but the said company did not deliver same at destination to defendant's local attorney until 10 o'clock p. m. on the 22d of August, who immediately presented same to State's counsel for consideration, and the same was thereafter submitted to the judge at three minutes to 12 o'clock p. m. on the last day for filing, who for want of time did not examine and order the same filed until the 23d of August, which was the eleventh day after adjournment. Held, on motion to strike said statement from the record, that under the peculiar circumstances. the diligence was sufficient and that the same would be considered by the court on appeal. DAVIDSON, Presiding Judge, dissents from this ruling.

**2. Change of Venue to Other than Adjoining County.**

The authority to change the venue of the prosecution is within the sound judicial discretion of the trial judge, and his action in the matter will not be disturbed unless a flagrant violation of discretion be shown. Where the venue was changed to a distant county but on a line of railroad leading from where a great number of the witnesses resided, Held, there was no abuse of discretion by the judge ordering the change of venue.

**3. Juror—Qualification as to Defense of Insanity.**

A juror is not disqualified because he is prejudiced as to the defense of insanity from the fact that he believes such pleas generally unfounded, who states that he knows nothing of the facts in the case on trial, and that if he is selected as a juror he could give the testimony as to insanity the same consideration as he would any other testimony or defense in the case.

**4. Juror—Peremptory Challenge.**

A defendant can not be heard to complain as to the selection of a juror where he has not exhausted the peremptory challenges accorded him.

**5. Witness—Impeachment.**

· On a cross-examination a witness may be asked for the purpose of impeaching his testimony if he has not been indicted for any named felony.

**6. Witness—Asking Improper Questions—Practice.**

Where the prosecuting attorney has asked a witness a question which in part is improper and prejudicial to defendant, and the court, after reprimanding him, strikes out the improper portion and instructs the jury to disregard it, Held, this renders harmless any error in propounding the improper portion of the question.

**7. Insanity—Evidence—General Reputation.**

General reputation of insanity can not be proven.

**8. Murder—Insanity—Delusion—Evidence.**

On a trial for murder, where the defense was insanity, and a witness had testified to hallucinations and fears of mob violence on part of defendant caused by excessive use of morphine and cocaine, Held, it was competent on cross-

examination of the witness as to defendant's insanity to prove that defendant's fears as to mob violence were not delusions but were conclusions of a sane mind, by permitting the witness to testify that the parties defendant named and pointed out as composing the mob were parties who had condemned him (defendant) for his connection with a prior killing. The said testimony was moreover properly limited in the court's charge.

**9. Witness—Irrelevant Question—Practice.**

Where the prosecution has asked a witness an improper, irrelevant question which the court excludes upon objection by defendant, this renders the error harmless where the question itself was not of a prejudicial character.

**10. Same.**

Where the prosecuting attorney on cross-examination of a witness has asked him as to the other murders committed by defendant, and the judge of his own motion reprimands the attorney and instructs the jury that the question was improper and they must disregard it, this eliminates reversible matter from the error.

**11. Insanity—Opinion Evidence.**

Unless a witness is introduced as an expert he can not give his opinion as to the defendant's insanity based upon hypothetical questions.

**12. Evidence.**

Where it becomes necessary to explain certain testimony admitted as to an interview between defendant and his wife while defendant was in jail, it was competent to ask the jailer if he had not prohibited any intercourse between defendant while in jail and the outside world unless he, the jailer, was present.

**13. Murder—Evidence—Defendant's Holding His Office.**

On a trial for murder, where it appeared that defendant was a county judge, it was competent to prove that he was still holding said office. The evidence was admissible for consideration as to his removal from said office under provisions of article 3530, Revised Statutes, in case of his conviction for the murder.

**14. Bill of Exceptions to Evidence Admitted.**

A bill of exceptions to admitted evidence is insufficient which only states its irrelevancy as the ground of objection.

**15. Insanity—Evidence as to Demeanor of Defendant During the Trial.**

On a trial for murder, where the defense was insanity and an expert had testified that where insanity was produced by cocaine and morphine the effects of such insanity would wear off in six months after the party was cut off from the use of said drugs, Held, it was competent to prove by the sheriff having defendant in his custody what was the character of his demeanor, conduct, and conversation during his trial in going to and from the courthouse to the jail. Following Burt v. State, 38 Texas Criminal Reports, 438.

**16. Bill of Exceptions to Excluded Testimony.**

A bill of exceptions to the exclusion of testimony is insufficient which fails to state the object and purpose for which the testimony was offered.

**17. Expert Evidence—Witness—Insanity.**

An expert on insanity can not testify as to whether a witness in a case who is addicted to the use of morphine and cocaine is testifying truthfully or under delusion. Such testimony would invade the province of the jury.

**18. Insanity Evidence.**

Where on a trial for murder the defense is insanity, it is competent to prove by a witness that a short time before the killing he had heard defendant testify as a witness on a trial for murder, and that from his appearance and testimony on said trial he saw no indications of insanity.

**19. Argument of Counsel—Reading Law, etc., to Jury.**

It is discretionary with the trial court to allow counsel in argument to read law or extracts from speeches to the jury.

**20. Special Instructions—Practice.**

It is not error for the court to refuse special requested instructions where the same principles of law are fully embraced in the court's charge as given to the

**21. Homicidal Mania—"Irresistible Impulse."**

The doctrine of "irresistible impulse" to commit crime is not a sound one. If a party has an irresistible impulse to commit crime and does not know the nature and quality of the act, he is insane; but if he does know right from wrong and knows his act to be wrong, he is not insane. HENDERSON, Judge, dissents as to the defense of "irresistible impulse."

**22. Temporary Insanity from Use of Morphine and Cocaine—Charge.**

A charge of court which instructs the jury to acquit if the continued or recent use of morphine or cocaine or both, or combined with whisky, rendered defendant temporarily insane and during such insanity he committed the homicide, is sufficient.

**23. Murder—Manslaughter—Charge.**

On a trial for murder, where the proof shows that defendant with premeditated design went to the house of deceased, and standing at the gate shot deceased, who was unarmed, without any excuse unless he, defendant, was insane, such a killing would be murder, and the issue of manslaughter not being involved, in such state of facts it was not error for the court to fail and refuse to charge upon manslaughter.

ON MOTION FOR REHEARING.

**24. Murder—Evidence as to Defendant's Wife's Insanity.**

On a trial for murder, where the defense was insanity and where defendant's wife had testified as a witness in his behalf, it is not admissible for defendant to prove by an expert the insanity of his said wife. The sanity or insanity of defendant's wife could not throw any light upon the mental status of defendant.

**25. Murder—Insanity—Manslaughter—Charge.**

On a trial for murder, where the only defense is insanity, manslaughter can not be an issue. There is no grade of insanity that mitigates crime. It never operates as a mitigation of homicide, as it goes only to the punishment and not to the character of the act itself. In such a case it is not error to fail or refuse to charge upon manslaughter.

APPEAL from the District Court of Williamson, on a change of venue from Robertson. Tried below before Hon. R. E. BROOKS.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

Appellant, O. D. Cannon, who was at the time of the commission of the homicide county judge of Robertson County, on March 23, 1899, shot and killed deceased, W. A. Gray, for which homicide he was on June 9, 1899, indicted by the grand jury of Robertson County, charging him with murder upon his malice aforethought. The indictment was found at the June term of the District Court of Robertson County. On July 10th, and at the same term of the court, the district judge of said Robertson County, acting upon his motion, and reciting that the court was satisfied that a trial alike fair and impartial to the accused and the State could not be had in Roberstson or any of the counties adjoining the same, and considering the circumstances of the case, deemed it just to all parties that the venue of said case be changed to Williamson County,—it being in an adjoining district to the district including said Robertson County; and the court then being in session in said Williamson County. The transcript of the proceedings had by the District Court of Robertson County, were certified, together with all of the original papers, and the same were duly filed in the District Court of Williamson County.

Appellant's first bill of exceptions complains of the action of the trial judge of the District Court of Robertson County, who, upon his own motion, changed the venue of this cause to Williamson County, the following being the grounds of said objection: 1. That Williamson County is not an adjoining county, but the counties of Leon, Limestone, and Falls each adjoin Robertson County, and that the venue should be changed to one of the latter counties. 2. That the statute contemplates that the change of venue, if made, shall be to an adjoining county to the county where the offense is alleged to have been committed. 3. Because Williamson County is a long distance from the county of Robertson; that appellant's trial will be among strangers, and by reason of said fact it will be difficult for appellant to have said trial in Williamson County; by reason of his being tried among strangers, he can not obtain a fair and impartial trial. In his qualification, the district judge states that Williamson County is on the same line of railroad as the town of Franklin, the county seat of Robertson County, where the greater number of the witnesses in the case reside; and that the District Court of Williamson County was at that time in session; and that the district in which Williamson County is embraced is an adjoining district to the county where the crime was committed.

In connection with the exception taken to the action of Judge Talliferro, a motion was made in the District Court of Williamson County practically setting forth the same ground as set forth in the bill of exceptions, which motion prayed that the district judge of Williamson County should retransfer the case to Robertson County, the forum from which the venue was changed, or to the adjoining counties of Leon, Falls, or Limestone.

From the evidence showing the facts connected with the killing, it appeared that deceased was standing unarmed in his own yard, and near his own door, when the defendant, without warning, came upon him and shot him down and left immediately, going hurriedly in the direction of his own home first, and then turning up the street towards town, where he met a citizen to whom he surrendered and delivered his pistol, and stated that he had killed deceased because deceased had ruined his family.

The State having rested, the defendant then showed by a large number of witnesses that he was in the habit of taking morphine, whisky, and cocaine in excessive quantities, and by reason of such use had become the victim of hallucinations, in which he was under the delusion that he saw persons prowling around his house at night for the purpose of killing him; that the deceased was one of these persons, and his house was the headquarters of the mob, and that he was in constant danger of assassination from this mob and from deceased. It was further shown that all this was but hallucination; that there was in fact no mob, and defendant was in no danger whatever, and no persons were prowling around the house at night. Defendant's wife, Rosa

Cannon, then testified, and stated that she had frequently seen persons prowling around the house at night for the purpose of assassinating defendant; that she recognized deceased as one of these persons, and that she had frequently seen him crawling about the yard, and passing by the house, and looking leeringly in; that his conduct alarmed her; that at other times she had seen him attempting to flash a dark lantern into defendant's bedroom at night. That she had watched him leave her premises at night, and would see him enter his own premises by the side gate, and would see the flash of the dark lantern. That she and defendant both frequently saw the deceased on these occasions. That often when defendant was not at home, these occurrences would happen, and she would report them to her husband on his return. That defendant was greatly alarmed and hired persons to guard his premises, and that he finally became suspicious of his friends and discharged the guards; and at last suspected and accused her of infidelity to him, and told her she was in league with his enemies, and was intimate with deceased. That on the evening of the killing he had announced to her his intention of resigning his office as county judge, and separating from her and leaving Franklin; that just before the killing defendant came home, and was in a rage, and again accused her of unfaithfulness and followed her out into the yard; and then, seeing deceased in his own yard, accused her of receiving a signal from him, left his house, and in a few minutes she heard the pistol shot that killed deceased. It was also shown that she was a victim to the morphine and cocaine habit, and used both drugs to excess. Here defendant rested.

The State then offered the testimony of the sheriff of Robertson County in rebuttal. He testified concerning the interview at the jail between defendant and his wife a few days after defendant was placed in jail, as follows, to wit: "Defendant said: 'Now, Rose, you know Gray was laying around our premises?' She replied, 'Of course I do, but I had nothing to do with it.' He said, 'Now, Rose, you know Gray looked in at our window and would cough around the house.' She replied, 'Of course I do, but I had nothing to do with it.' Cannon said, 'And you heard him clear his throat, didn't you?' And she said, 'Of course I did.' Cannon said, 'God damn it, Rose, tell the truth, tell the truth. Now, Rose, you know I thought you had something to do with it.' She answered, 'Of course I do, but I had nothing to do with it.' Cannon said, 'Rose, you know I thought you and Gray were too intimate.' She said, 'Of course I do, but it was not true.' Cannon said, 'You know Gray tried to locate me through our window.' She answered, 'Of course I do, and I got between you and the window so he could not kill you without killing me.' "

Defendant's other bills of exception will be found fully stated in the court's opinion below.

The Assistant Attorney-General submitted a motion to strike the statement of facts from the record because the same was not filed in the

lower court within the time allowed, and no sufficient excuse for the delay in filing was shown.

The motion was elaborately briefed by both parties. The matter is exhibited in extenso in the opinion.

Defendant's other bills of exception which are discussed in the court's opinion below are also so fully stated as to need no further illustration from the record.

*W. F. Robertson, .T. S. Henderson,* and *Spencer Ford,* for appellant, filed an able brief and argument.

*Dan S. Chesser* and *Rob't A. John,* Assistant Attorney-General, for the State, also filed an able brief and argument. These briefs, owing to their length, the Reporter regrets can not be reproduced.

The above attorneys for appellant also filed a motion for rehearing after the affirmance on appeal and accompanied this motion also with a most able argument, which for the reason above stated can not be reproduced. This motion for rehearing was overruled in Judge Brooks' written opinion below.

BROOKS, JUDGE.—Appellant was indicted in the District Court of Robertson County for the murder of W. A. Gray, and on July 10, 1899, the judge of said court, of his own motion, changed the venue to Williamson Count, where the cause was tried at the July term, and appellant was convicted of murder in the first degree, his punishment being assessed at confinement in the penitentiary for life.

The Assistant Attorney-General has filed a motion to strike out the statement of facts, because same was not filed within the ten days after the adjournment of the court, as provided by the order of the court. In reference to the diligence used in an effort to secure the statement of facts, we set out in full the affidavit of the learned judge, as follows: "I was the presiding judge of the District Court of Williamson County, Texas, in August, 1899, when the case of the State of Texas v. O. D. Cannon, charged with murder was on trial, and which case is now pending in the Court of Criminal Appeals. It is my recollection that a verdict in said case was returned on Tuesday, August 8th, or on August 9th. August 12th was the last day of the court—the date on which the term expired by limitation of law. The motion for new trial was overruled, and an order entered allowing ten days in which to make up and file statement of facts. When motion for new trial was overruled, I requested counsel for defendant, Cannon, to make up and present statement of facts at earliest date possible, as the evidence was voluminous, and that I desired to have time to examine statement of facts when presented before expiration of ten days from adjournment of court. Counsel for defendant promised to prepare said statement as soon as possible, and stated that they would present it to me Thursday, August 17, 1899, they thought. I waited at

Georgetown, after court adjourned, until August 17th, and said state-
ment not having been presented, I spoke to local counsel for defend-
ant at Georgetown, Hon. W. F. Robertson, about it, asking him why
they did not present said statement. He replied he did not know. I
still remained at Georgetown, Texas, waiting for said statement to be
presented, until the tenth day after adjournment of court, and in the
meantime I several times urged upon local counsel for defendant to
have said statement of facts presented. On the night of the tenth day
after the day of adjournment of court I was awakened in my room by
counsel for defendant, who presented to me the statement of facts
agreed to and signed by counsel for both sides. This was done at three
minutes to 12 o'clock. I had no time or opportunity to examine said
statement until the next day, and on the next day, it being the 23d
day of August, 1899, I spent nearly the entire day examining said
statement of facts, and, finding the same incorrect in many particu-
lars, I made such corrections in the same as were necessary to show the
facts as they were proven, and immediately signed said statement, and
had it filed by the clerk."

And in this connection we also quote, in substance, the affidavit of
Hon. T. S. Henderson, of counsel for appellant, who states the facts
necessary to a proper presentation of the question of diligence, as
follows: "The trial began at Georgetown on the 2d day of August,
1899, and was concluded on the 8th of August; the verdict being ren-
dered about 3 o'clock p. m. on that date. Anticipating a protracted
trial and examination of many witnesses, we secured, at our own ex-
pense, the services of a competent stenographer and typist, Henderson
Fowler, who resides at Cameron, and the office clerk of Henderson,
Streetman & Freeman, to take the proceedings and testimony on said
trial, and said proceedings and testimony were fully taken stenograph-
ically by said Fowler. The testimony was concluded on Monday,
August 7th, at about 2 o'clock p. m. Upon the conclusion of the trial,
the stenographer was directed to return at once to Cameron and begin
the work of transcribing upon the typewriter the proceedings of the
trial, as rapidly as possible. It was further understood that the local
attorney, Judge W. F. Robertson, should file a motion for new trial
at once, and that the same should be amended as soon as the bills of
exception were prepared; that Attorney Henderson should return to
Cameron and prepare the bills of exception, and, as soon as same were
ready, return to Georgetown, and assist in amending the motion for
new trial; and that same should be presented, together with the bills
of exception, and if the motion was overruled, notice of appeal should
be given. And in view of the fact that the record of the trial was
voluminous, and the term of the court nearing an end, he was to pro-
cure an order from the court of ten days after the adjournment of
the court within which to file the statement of facts. And Attorney
Ford, if the motion for new trial was overruled, was to come to Cam-
eron from his home at Bryan, and supervise the preparation of the

statement of facts, with the assistance of Attorney Henderson and the stenographer. The arrangement to have the work of transcribing the stenographic notes at Cameron was agreed upon.for the reason that both the stenographer and Attorney Henderson resided at Cameron, and had office, typewriting machines, and stationery and other facilities necessary for the prompt and expeditious transcription of the stenographic record and preparation of the bills of exception and statement of facts, and said facilities could not be secured at Georgetown without great inconvenience and expense. And accordingly said stenographer returned to Cameron forthwith, arriving there on the 9th of August, at about 11 o'clock a. m., and proceeded at once to comply with his instructions as above set forth. The first work done by said stenographer was in transcribing the testimony, but on Thursday morning the stenographer was directed by affiant to transcribe the proceedings relating to the bills of exception, and on Thursday and Friday, up to the time the train left, he was engaged in transcribing the notes of the bills of exception, and in receiving and transcribing the final bills of exception from the dictation of affiant. The bills of exception. were quite numerous and lengthy, as appears from the transcript filed, and were not finished until just before train time on Friday. Upon their completion affiant left at once on the train for Georgetown, for the purpose of presenting the motion for new trial and the bills of exception, and arrived at Georgetown that evening at about 7 o'clock, August 11th. Upon leaving Cameron for Georgetown, affiant instructed said stenographer to continue the transcription of the testimony, and get same ready as soon as possible, and told him Judge Spencer Ford, associate counsel, would come to Cameron as soon as he had the testimony ready, for the purpose of preparing the statement of facts. On the next morning, Saturday, August 12th, at about 8 o'clock a. m., affiant met the local attorney, W. F. Robertson, Esq., at his office, and with his assistance prepared an amended motion for new trial, and the same was filed in the District Court at Georgetown at about 11 o'clock, and the bills of exception at about the same time delivered to the judge of said court, Hon. R. E. Brooks, for examination and approval. The motion for new trial was read, and, the judge stating that he did not wish to hear any argument thereon, same was overruled, and notice of appeal given about 2 o'clock p. m. on said date. And thereupon said judge called to his assistance the attorneys representing the State, for the purpose of passing upon said bills of exception, and at about sundown on said date affiant went to the office of the State's counsel where said judge and attorneys were engaged in considering said bills for the purpose of inquiring concerning same, and found them still engaged in making additions, corrections and alterations in said bills; and finally, at about 11 o'clock p. m. on said date, the bills were approved and filed, and, as it was the last day of said court, an application was made and order entered allowing ten days after the adjournment in which to file the statement

of facts. Affiant immediately notified his associate attorney, Ford, at Bryan, that said motion had been overruled, and requested him to come to Cameron and supervise the preparation of the statement of facts as had been agreed on, and stated the stenographer would probably be ready with the transcription of the testimony by Wednesday or Thursday following. And also that affiant, who was a member of the board of regents of the University of Texas, would be required to attend a meeting of said board at Austin during said week, and might not be able to assist in the preparation of said statement until late in the week; and it was further agreed between affiant and Attorney Robertson that, as soon as the statement of facts was prepared, affiant would either return to Georgetown in person and bring the same, or he would send it by express to the said Robertson, who would present it to attorneys for State, and afterwards to the judge for approval; it being understood affiant would go in person if he could do so without great inconvenience. It was known to affiant and to said Attorney Robertson at the time that there was direct connection by express between Cameron and Georgetown; that said express was carried on by means of personal messengers, and the transmission of all parcels by said express was safe and expeditious, and was the usual medium for the carriage of valuable packages between said points. Affiant returned to Cameron, and found said stenographer busily engaged transcribing the testimony, and about Tuesday, August 15th, went to Austin to attend said meeting of said board of regents as aforesaid, and as soon as his business at Austin was concluded, returned to Cameron, arriving on Friday, the 18th of August. Affiant found that said Ford had arrived at Cameron, and was engaged with said stenographer in the preparation of the statement of facts. The said stenographer had not completed the transcription of the testimony, but said Ford was using such of the testimony as had been transcribed in dictating to said stenographer said statement of facts. Affiant immediately joined said Ford and said stenographer for the purpose of assisting in the preparation of said statement, and made a pencil longhand statement of the testimony of some of the witnesses, and on Saturday, August 19th, fearing there might be delay in completing said statement of facts, they called to their assistance T. A. Robinson and Burns Hill, who are skilled operators of typewriters. They had two typewriting machines, and directed said Henderson Fowler, and T. A. Robinson and Burns Hill to proceed at once transcribing so much of the statement of facts as had been dictated; said Henderson Fowler transcribing from his stenographic notes the dictation, and Burns Hill reading the longhand statement of facts to said Robinson, who transcribed them on the typewriter. Judge Ford, affiant, and said typewriter operators continued at work until 12 o'clock on Saturday night, and on Sunday morning Judge Ford, desiring to return to Bryan, on account of important business engagements, and finding affiant could probably prepare the longhand notes

of the remaining part of the statement as rapidly as the same could be typewritten by said operators aforesaid, the said Ford did thereupon leave for Bryan, and said Henderson continued, with the assistance of said operators, to finish said statement of facts, said Henderson furnishing copy as fast as said operatives required it. The typewriting was completed on Sunday night, except the certificates and binding the pages together. And on Monday morning early the certificate was completed, and the typewritten pages bound together, and the statement thus completed. It lacked but a very short time before train time when said statement was completed. Said affiant had neglected all other business, in order to assist in the preparation of said statement of facts, and found there were matters of importance requiring his attention at Cameron, which made it not only inconvenient, but almost impossible for him to leave and go to Georgetown for the purpose of taking said statement of facts. It was also not convenient to send a special messenger, by reason of the fact that the accumulation of business at his office required the services of his stenographer, and by reason of the further fact that, in addition to the time, the cost and expense of the trip to Georgetown would be considerable; and affiant further knew the fact that there was express connection by railway trains between Cameron and Georgetown, and that a package sent from Cameron to Georgetown by express, if dispatched in the morning of Monday, August 21st, would, in due course of transit, reach Georgetown at about 7 o'clock p. m. of that date, which was about as soon as a special messenger could, by ordinary method of railway travel, make the trip. Affiant had previously sent packages through the agency of said express company to Georgetown, and the same, without exception, had been promptly and safely delivered within the period of time aforesaid; that is, between the leaving of the train from Cameron in the morning and the arrival of the same at Georgetown at 7 o'clock in the evening of the same day. Said express business, as before stated, was carried on by the medium of special personal messengers, who received parcels for transmission; and, as before stated, affiant could not, without laying aside all of his other business, go in person with said package to Georgetown, and he had every reason to expect same could and would be safely transported by express company, and delivered to his associate counsel, W. F. Robertson, at Georgetown, according to the understanding between himself and said Robertson. Accordingly affiant had the statement of facts delivered to the agent of the Wells-Fargo Express Company at Cameron on Monday morning, August 21st, for the purpose of being carried to Georgetown, and delivered to said W. F. Robertson. Said agent for said company received said package, undertaking to so safely deliver same as aforesaid, and being notified of the importance of the prompt and expeditious delivery. Said package was duly addressed to W. F. Robertson, at Georgetown, and the express charges prepaid by affiant, on the 9:30 o'clock train from Cameron, arriving at Rockdale at about

10:30 o'clock a. m. on the same day, and, as affiant is informed and states the fact to be, was duly received by the agent of said express company at Rockdale, and was by him forthwith in person carried to the office of the Pacific Express Company in said Rockdale, for the purpose of being forwarded to Georgetown; said Wells-Fargo Express Company having an arrangement with said Pacific Express Company whereby it received packages as a connecting line from said Wells-Fargo Express Company for transportation, said Wells-Fargo Company operating its business from Cameron to Rockdale, and said Pacific Express Company operating its business from Rockdale to Georgetown. The packages delivered by said Wells-Fargo Company from the morning Aransas train aforesaid, at Rockdale, to said Pacific Company, within due time would be forwarded by said Pacific Company, and arriving at Georgetown at about 7 o'clock p. m. on the same date. The agent of said Wells-Fargo Company did in person take said package to the office of said Pacific Company in Rockdale, and left the same in said office at the usual place of deposit, according to the custom of the said two companies; but, said Pacific Company's agent not being then present in person, the same was left at said place of deposit, according to the custom which prevailed between said express companies. Affiant is informed, and states the fact to be, that the agent of said Pacific Company, either misunderstanding the address, or said address being in some way obliterated, failed to promptly transmit the said package on the first train, and held same at its office for further instructions from said Wells-Fargo Company. As a further precaution to procure the delivery of said package promptly, affiant the same date wrote a letter to said W. F. Robertson, at Georgetown, notifying him that said statement of facts had been forwarded by express. Said letter was received by said Robertson on the 7 o'clock train, and said statement not having arrived, said Robertson forthwith, as soon as he could, notified said Henderson of the failure of said statement to arrive. Said notification was given over the telephone on Tuesday morning early, August 22d, which was as soon as he could communicate over said 'phone to affiant. Affiant immediately notified the agent of the said express company at Cameron, and said agent in turn notified the agent at Rockdale, and said agent at Rockdale went forthwith to the agent of the Pacific Company at Rockdale, and finding said package had not been forwarded, did thereupon have same forwarded at once; said package leaving Rockdale at about 10 o'clock a. m. on said date, and arrived at Georgetown at about 12:40 p. m. of the same day. The further facts concerning said statement of facts are disclosed in the affidavit of Judge W. F. Robertson, to whom the same was delivered by the express agent at Georgetown. Affiant shows further, that he took all the precautions that could be reasonably expected, in order to secure the safe, prompt, and speedy transmission and delivery of said statement of facts; that he made use of the safest and most expeditious method of transportation known in the

State; that a special messenger would not have been a safer means of transmission, by reason of the fact that said express company has facilities and employes and the personal services of agents, specially trained, for the purpose of safely and expeditiously carrying parcels over its line from Cameron to Georgetown; that said express company is a chartered agency, recognized by law as an agency for the transportation of such packages; that it is universally regarded as a safe agency, and the most expeditious agency that can be obtained; that said agency is resorted to in preference to special private messengers in transactions of the very greatest importance, where speed and expedition are desired, and where property of great value is to be transported; that affiant, not being able to leave, as before stated, and go in person, sought this means of transportation, and in doing so believes he used all of the diligence a prudent man would have been expected to use under similar circumstances; that said delay was not an intentional neglect on the part of the messengers of said company, but was one of those unforeseen, accidental and unexpected occurrences which happen in the transaction of business by the most diligent persons." W. F. Robertson in his affidavit, in addition to the above, states: "That he received the statement of facts from the express about 1 o'clock p. m., August 22d, the tenth day after the adjournment of the court; and at about 2 o'clock presented same to State's counsel for agreement, and they held the same under consideration until 11:52 o'clock p. m. of said date, when they were duly agreed to by counsel for State and defendant, as provided by law, to be approved by the judge. The judge, being notified about 11 o'clock p. m. of the circumstances, declined to go to the courthouse to approve same for want of sufficient time that night. The statement of facts so agreed to by all parties, was then delivered to the judge at his room by Robertson, at about 11:55 p. m. o'clock on said date, and for want of sufficient time the same was not approved by the judge until about 3 o'clock the next evening." There are several other affidavits by counsel and other parties with reference to this matter, but we deem the above is sufficient to a proper understanding of the question of diligence on the part of appellant in procuring a statement of facts.

We have heretofore held that a failure to file the statement of facts within the ten days, if not due to the laches of appellant or his attorney, and such failure was the result of causes beyond his control, would not deprive defendant of said statement in passing upon the merits of the case; and in considering the question of diligence, each case must rest upon its own peculiar facts, viewed, not in the light of subsequent events, but viewed in the light of all the surroundings at the time the party is exercising diligence in preparing the statement of facts. George v. State, 25 Texas Crim. App., 242; Suit v. State, 30 Texas Crim. App., 322. In Corothers v. Lange, decided by the Court of Civil Appeals of Texas, Third District (a copy of which opin-

ion appellant attaches to his argument in support of his motion to permit the statement of facts to remain as a part of the record), on a motion to affirm on certificate, because the record was not filed within the ninety days, as required by law, the court said: "It is clear from the facts, as stated in the affidavits of both parties, that the transcript could have been filed before the ninetieth day, but the question arises whether the appellants are required to forward it to the clerk of this court before the ninetieth day, provided the circumstances are such as would indicate to a man of ordinary prudence and caution that, if steps were taken by the usual facilities at hand on the ninetieth day, it could and should have been filed before the expiration of that day. The party appealing has the last day allowed by law in which to file the transcript. From the facts as stated by appellants, it is shown that the transcript went into the possession of the express company within plenty of time to have it delivered here in the city of Austin before the expiration of the ninetieth day, and that the failure to do so was attributable to the negligence of the express company." We think this decision is in consonance with our statute in reference to the filing of statements of facts within the ten days as required by law. As indicated in the affidavit of appellant's counsel, if the statement of facts had been delivered by the express company, as he had every reason to believe it would have been, he would have secured the filing of the statement of facts within the ten days allowed. We would not be understood as holding that the trial court in holding the statement of facts over until the eleventh day to make certain corrections was at all in error, but we highly commend the course he pursued in reference to the matter. It was his sworn duty not to approve the statement of facts, unless the same was in consonance with the facts proved upon the trial of the case. He did not have time to do this within the ten days, the statement of facts having been presented to him only a few minutes before the ten days expired. Without elaborating upon this matter, we deem it only necessary to say that, under the peculiar facts as presented in the foregoing statement, we think it is proper and right to consider appellant's statement of facts in this record.

In order to properly understand the principles of law hereafter discussed, we deem it proper to make a brief statement of the salient features of the evidence. Appellant was county judge of Robertson County at the time of the homicide, and had been for some time addicted to the use of cocaine, morphine, and whisky, and on divers occasions labored under the mental hallucination that various parties in the town of Franklin desired to kill him. He would close the blinds of his home at night, imagining, as he termed it, "a mob" was around the house, seeking to assassinate him through the windows. He excluded all air from the house by tightly closing the blinds, and slept on the floor, imagining he would be assassinated in bed. In order to get a view of his supposed and phantom enemies, he loosened a brick

in the back of the chimney, removing and replacing it at his pleasure. He hired persons to guard his house on various occasions prior to the homicide. The testimony on the part of the State tended to show that appellant, while county judge, would go to sleep occasionally on the bench, but in the trial and disposition of the causes before him, and in his conversations and conferences with divers and sundry parties immediately before the homicide, he showed no evidence whatever of insanity, but the very converse; that he was a man of more than ordinary mentality. Deceased, Gray, was a lawyer, lived near appellant, and had. been superintendent of public instruction at the same time appellant was county judge, but the Commissioners Court had abolished the office before the homicide. Georgia Gray, deceased's wife, testified substantially: That deceased, on the day of the homicide, came home from his office, and, after sitting on the front gallery reading awhile, in company with witness, fed the pigs while she milked the cow, and ate supper. After supper, being on the front gallery, was called by deceased, stating the children needed her in the dining room, and on her way met deceased in the hall, who was eating a piece of cake. That she went in the dining room, and was spreading butter on the bread for the children, when she heard deceased go out on the front steps, and about the same time heard the shooting. Four shots were fired in rapid succession,—a slight pause intervening between the second and third shots. Witness ran to the middle hall door, about four or five steps from the dining room, and saw deceased fall face downward, with his face towards the steps of the gallery, and his hands thrown up. She screamed, and ran to him. When she reached him, his face was lying on the bottom of the first step of the gallery, and his feet towards the gate. That she saw the man who did the shooting. He was behind the left-hand gate post. His hand was elevated, and looked to be up over the gate. He ran in the direction of appellant's front gate, across the street, rather west from deceased's house. That she did not recognize the man. Deceased was in his shirt sleeves, unarmed, and had no pistol or gun of any kind. J. C. Renfro, who kept a livery stable about three blocks from deceased's residence, heard the four shots fired in rapid succession, there being a slight intermission between the second and third shots, and also heard the screaming at deceased's house. He ran immediately in that direction, and met appellant about midway. Appellant had a 45 six-shooter in his hand, and was going in the direction of the courthouse, in an easterly direction. Witness asked him what was the matter, and he replied, "I have killed Gray." Witness asked why he had done that, and he said he did it because Gray had ruined his family, and asked witness to help find the sheriff, and at that time T. A. Sims and defendant's wife came up.

Appellant introduced a great deal of evidence tending to show mental derangement on divers and sundry occasions. Among other instances, a conversation with his brother-in-law, in which he imputed

a want of chastity to his wife, and said deceased was familiar with her. He talked to other parties about the matter, and talked to various parties about a mob trying to kill him. He stated he was going to resign his position as county judge, and went so far as to see some of the commissioners, asking them to select a certain party in his place, after his resignation. His reason given for resigning was to accept a more lucrative position in the trial of railroad cases. It is unnecessary to make a full and complete statement of all the circumstances detailed in the record, covering 167 pages of facts, but we deem the foregoing sufficiently explicit to present the questions of law raised in the record.

Appellant's first bill of exceptions complains of the district judge of Robertson County changing the venue upon his own motion, upon the grounds (1) that Williamson County is not an adjoining county, but the counties of Leon, Limestone, and Falls each adjoin Robertson County, and that the venue should have been changed to one of the latter counties; (2) that the statute contemplates, if a change of venue is made, it shall be to a county adjoining the one where the offense is committed; (3) that Williamson County is a long distance from Robertson County, and that defendant's trial will be among strangers, and by reason of said fact it will be difficult for him to have said trial in Williamson County, and he can not obtain a fair and impartial trial. The judge in his qualification to the bill states that Williamson County is on the same line of railroad as the town of Franklin, the county seat of Robertson County, where a great number of the witnesses resided. We have heretofore held that the statute with reference to the change of venue leaves it within the sound discretion of the trial court to change the venue whenever he is satisfied that a trial alike fair and impartial to the accused and the State can not be had in the forum where the crime was committed. We have also held that this is a judicial, and not a personal, discretion, and, unless there is a flagrant violation of it, we will not disturb his finding. The question here involved was passed upon by us in Nite v. State, *ante*, p. 340, adversely to appellant's contention. And see also Boyett v. State, 26 Texas Criminal Appeals, 689. He also filed a motion in the District Court of Williamson County, asking said court to retransfer the cause to Robertson County. The court overruled the motion, and we do not see any error in this action. The judge not having violated his discretion in transferring the case to Williamson County, we see no error in the court's refusal to retransfer the same.

Appellant's second bill of exception is to the action of the court in not sustaining appellant's challenges to the jurors Monroe, Haley, and Smith. Each of these jurors state they had a prejudice against the plea of insanity. The court's explanation to the bill shows that said jurors stated they had no opinion upon appellant's plea of insanity, if he set up one; that they had no prejudice or opinion as to such defense in this case, and their prejudice against said plea only ex-

tended to the fact that they thought said plea was often unfounded, not being based upon facts, and, if selected as jurors, they could and would consider such defense without prejudice against said plea, and would give the same consideration to the testimony relating to the defense of insanity in this case as to any other testimony or as to any other defense interposed. We do not think the jurors were disqualified, under this statement. Thompson v. State, 19 Texas Crim. App., 593; Kennedy v. State, Id., 618. Even concede this ruling of the court was error, yet it was subsequently rendered harmless. None of these jurors sat in the case, as indicated by the record. For, after eleven jurors had been selected, by both the State and appellant, the juror Walter Girven was tendered appellant. Said juror was one of several talesmen properly summoned and tendered. Before the list of talesmen was given appellant, and before appellant had exhausted his challenges, the State, by motion, joined in appellant's challenge for cause to the last juror, Dick Smith; and the court granted the State's motion, and set aside said juror for cause, and notified appellant he would be allowed an additional peremptory challenge. Thereupon appellant exhausted his fourteenth challenge, counting the additional one allowed in lieu of the one charged against him for the juror Dick Smith. And, when the juror Walter Girven was passed upon and accepted by the State, defendant was informed again that he had not exhausted his challenges, but still had an additional one. Thereupon appellant declined to accept the additional challenge, and declined to utilize it by challenging the juror Girven, whereupon Girven was sworn, and appellant still had, at the time the entire panel was complete, one challenge unexhausted. We think this qualification of the court disposes of appellant's objection, even if there were any error in same.

Appellant has six bills of exception involving the same propositions of law, and they will be considered together. In bill number 15, on cross-examination, the State asked the witness if he had been indicted for burglary; by bill number 16, the State asked if the witness had been indicted for murder; number 17, if witness had not been indicted for the offense of forgery; number 18, witness was asked if he had not been indicted for the offense of assault with intent to murder; and, in bill number 19, the State, on cross-examination, asked the witness if he had not been twice legally charged with murder. We have frequently held that even the defendant himself may be impeached on cross-examination by questions as indicated in the above bills. Clark v. State, 38 Texas Crim. Rep., 30. The witness can be asked on cross-examination any of these questions as touching his credibility as a witness. Carroll v. State, 32 Texas Crim. Rep., 431; Goode v. State, 32 Texas Crim. Rep., 505; Bolton v. State (Texas Crim. App.), 39 S. W. Rep., 672.

In bill number 22 the State, on cross-examination, asked Dr. L. M. Bassett this question: "You and defendant are brothers-in-law, are

you not?" The witness answered, "Yes." Whereupon the question was asked, "Were not you and another indicted for murder in Robertson County?" Appellant objected to the last question, because not proper to attack the credibility of a witness by testimony of the character sought to be elicited by such question; that it is not relevant to any inquiry in the case as to whether or not witness and another had been indicted in Robertson County for murder; that said question was asked, in connection with the former question, for the purpose of conveying to the jury the impression that defendant and witness had been jointly indicted for murder in Robertson County, and was asked for the purpose of unfairly prejudicing the witness and defendant before the jury. The objection was sustained so far as the question related to "another," but overruled so far as it related to witness being indicted for murder, and witness was permitted to testify that he had been indicted for murder in Robertson County. The court's qualification states that he reprimanded counsel for asking the latter question, and, although not requested by defendant's counsel, instructed the jury to disregard said question, and not to allow same to prejudice them in any way against defendant. We think this disposes of the bill, and renders harmless any error there might have been in the asking of the question.

Bills numbers 7, 9, 10, 12, 13, and 14, respectively, raise this question that the court erred in refusing to allow appellant to prove, by hearsay evidence and general reputation, the fact of appellant's insanity. Without considering all of these bills seriatim, we desire to say that general reputation of insanity can not be proved. This exact question was decided against the contention of appellant in Ellis v. State, 33 Texas Criminal Reports, 86. And see also Brinkley v. State, 58 Ga., 296; Busw. on Insanity, sec. 237.

Bill number 11 shows appellant introduced T. B. Jones, who testified that during the spring and summer of 1898 appellant was addicted to the excessive use of cocaine and morphine; that the use of said drugs had produced in his mind a hallucination and delusion to the effect that a mob were pursuing him for the purpose of assassinating him, and that they were lying around his house at night; that on a certain occasion appellant came to witness at the courthouse, and complained of the mob and his fears of assassination, and appellant pointed out of the window to where a number of men were standing, and stated they were his enemies, and were plotting to take his life, and appealed to witness for protection, and asked him to protect him with guards at his house, etc. Thereupon the State, on cross-examination, offered to prove by said witness that J. B. Winfrey had been killed at Franklin a short time prior to the occasion referred to above; that defendant was a witness for Fred Gann, who was charged with killing said Winfrey, and that the persons pointed out to witness, as above stated, were T. A. Sims, C. W. Kinnard, Henry West, and others; that said persons condemned defendant in connection with the killing of Winfrey.

Defendant objected to the introduction of said testimony, because irrelevant and immaterial; that it was an effort on the part of the State to prejudice defendant, and was calculated to injure defendant in his trial. The court overruled the objections, and admitted the testimony, attaching the following qualification to the bill: "State's counsel stated said testimony was offered upon the issue of defendant's sanity, to show that defendant's fears that a mob, composed of these persons who openly condemned him in connection with the trial of Fred Gann for the killing of Winfrey, were trying to kill defendant, were not groundless nor insane delusions, but were the conclusions of a sane mind, based upon said facts, and said testimony was admitted for said purpose and was limited by the court in his charge to the issues upon which it properly had a bearing." This clear and succinct statement of the reasons why the testimony is admissible needs no elaboration at our hands, but suffice it that for such purpose, as indicated in the explanation, it was admissible, and the court did not err in admitting and properly limited it in his charge to the jury.

After appellant's witness T. B. Jones had testified, among other things the State asked said witness this question: "If the people [meaning the people of the town of Franklin, Robertson County] did not hold an indignation meeting after the acquittal of Gann." Appellant objected to said question, and the court promptly sustained the objection. The ground upon which he presents this bill is not to the ruling of the court, but because the asking of said question was calculated to prejudice defendant before the jury, and was done with that purpose in view on the part of State's counsel. We will not be able to go into the design or purpose of counsel in asking this question, but as presented to us it does not show that appellant has been prejudiced. We do not mean to be understood as approving the practice of trying to lug into the case irrelevant testimony in order to derive benefit therefrom, and not give appellant the right to reserve his bill. The court excluded the testimony, which was all he could do. We concede it was not proper for the State to ask the question. It was not relevant to any issue, and pertained to no fact, yet, in view of this record, we can not see it has prejudiced appellant to such a degree as authorizes a reversal.

In bill number 23 appellant complains of State's counsel on cross-examination asking Brady this question: "Defendant was not insane when he killed those other three men in Hearne, was he?" Appellant objected on the grounds stated above in bill number 20, and the court appends the following explanation to the bill: "The court sustained the objection and reprimanded State's counsel for asking said question. Defendant's counsel made no request, orally or otherwise, for the court to instruct the jury to disregard said question, but the court in his charge instructed them that such question was improper; that there was no evidence before them that defendant had ever committed any other offenses than that for which he was on trial; and that they should

not allow the asking of such question to in any manner prejudice defendant in this case, nor consider such question." As stated above, we can not too strongly denounce such conduct on the part of the State's counsel, but the court has eliminated any reversible error in this matter. Bill number 24 is reserved to substantially the same character of question, the court having appended the same explanation and charged the jury as in bills numbers 20 and 23, and it is unnecessary to further discuss this matter.

Bill number 4 shows that J. C. Renfro was asked by appellant if he had not been elected on the same political ticket to the office of sheriff that defendant was elected to the county judgeship of Robertson County. This testimony was inadmissible for any purpose, and the court properly sustained the objections of the State.

In bill number 25 appellant complains of the court sustaining an exception to the following question asked said witness Renfro: "At the time you met Cannon on the night after he killed Gray, if you had known he had used cocaine immoderately for a long period of time, and that such use had so affected his mind as to cause him to believe Gray had seduced his wife, and was haunting his premises at night, and that as a matter of fact there was no foundation whatever for such belief, but same was a pure hallucination and delusion, would you think him a sane man?" That said witness would have testified: "As a fact, I would, having known that he had been using that drug." The State objected, on the ground that witness was not competent to testify in answer to a hypothetical question, not being an expert. The court properly sustained the objection. We have held a witness may testify to facts within his knowledge, and then give his opinion as to sanity or insanity based upon such facts, even though he is not an expert, but that he can not give his opinion upon hypothetical questions unless he is introduced as an expert upon insanity. Wills. Texas Crim. Stats., art. 40; Burt v. State, 38 Texas Crim. Rep., 397; 39 L. R. A., 305; Ellis v. State, 33 Texas Crim. Rep., 87; McLeod v. State, 31 Texas Crim. Rep., 331; Whart. Crim. Ev., sec. 417.

Bill number 26 complains that the court permitted State's counsel to ask Guy Townsend the following: "I will ask you if you confined him [meaning defendant] in jail for some time afterwards [meaning after the killing of Gray], and whether you prohibited any intercourse between him and the outside world, except his attorneys, without yourself being present." Defendant objected, because it sought to elicit irrelevant testimony, and was calculated to prejudice defendant. The objections were overruled, and witness testified he had confined defendant in jail for some time afterwards, and prohibited intercourse between him and the outside world, except with his attorneys, unless witness was present. And in the same connection State's counsel also asked said witness "if he [defendant] persisted to hold onto his office as county judge, or whether he gave it up." Defendant objected, because irrelevant. The judge's qualification is as follows: "Said testimony

as to intercourse with people on the outside of jail, except defendant's attorneys, was admitted for the purpose of explaining the interview between defendant and his wife, while in jail, which was testified to by this witness, Guy Townsend, immediately in this connection, and without which testimony being set out in this bill neither the purpose nor pertinency of said testimony set out herein can be understood. The testimony as to defendant holding onto the office of county judge was admitted upon the issue of the proper judgment to be rendered in case of conviction in order to remove defendant from said office, and said witness also testified as to acts of defendant while in jail, acting in his capacity as county judge, which was also admissible upon issue of defendant's sanity." We think the explanation shows the testimony was admissible. Furthermore, the bill does not comply with the rules, as the only ground of objection is its irrelevancy. This is not a sufficient presentation of objection to authorize us to review the bill. But even conceding the bill well taken, under article 3539, Revised Civil Statutes, the testimony was admissible, as indicated in the explanation, for the purpose of removing appellant from said office.

In bill number 27 appellant complains of the testimony of Sampson Connell, sheriff of Williamson County, who testified he had defendant in his custody during the trial about two weeks. Then the State asked: "What is the demeanor of defendant after he gets out of the courthouse and goes to jail?" Appellant objected to this testimony, because inadmissible, incompetent, and calculated to prejudice the jury against defendant, and because defendant had introduced no evidence to show his mental condition at the time of the trial, as his mental condition at the time of the trial was not an issue. Said witness was permitted to testify that defendant's demeanor after he gets out of the courthouse and goes to the jail is that he is talkative and lively, and does not exhibit any dejection or melancholy, and seems perfectly natural; that from his conversations and conduct, as testified, the witness is satisfied he is sane; that defendant looked at things along the street like other people, commented upon them, and also commented on the trial and proceedings in the courthouse during the trial of the case. The judge appends the following explanation: "Dr. Worsham had previously testified, as a medical expert, that if defendant, by the use of cocaine and morphine, had hallucinations and delusions to the extent of becoming insane, he would not likely recover from same under six months; that, while he might possibly recover sooner, it was not at all probable; that traces of such delusions would exist to such an extent as to be easily noticed by one conversing with him. Said witness further testified that defendant during the trial, while in court, sat with his head bowed on his hands, apparently not noticing or taking any interest in the proceedings, and appeared dejected." The question has been decided adversely to appellant's contention. See Burt v. State, 38 Texas Crim. Rep., 438, 39 L. R. A., 305; Adams v. State, 34 Texas Crim. Rep., 470. Without further discussing the ques-

tion, we simply say: No reason has been presented to us for changing the rule therein stated, and we are convinced it is the law.

In bill number 28 appellant complains of the refusal of the court to permit him to prove the professional opinion of Dr. Worsham as to the sanity of appellant's wife, Mrs. Rosa Cannon. The bill is lengthy, the hypothetical question covering several pages. The explanation of the court to the bill is as follows: "Defendant had introduced Rosa Cannon as a sane and credible witness. Other witnesses for defendant had testified that there was no truth in her statement about persons prowling around her house, as testified by said Rosa Cannon, and then defendant, for the apparent purpose of supporting the credibility of said witness where it conflicted with other witnesses for defendant, offered testimony of an expert apparently to explain her testimony so far as it contradicted the other witnesses for defendant on the same question. Besides, the opinion of the expert was asked upon his having heard the witness Rosa Cannon testify, taken in connection with the hypothetical question, and made the witness invade the province of the jury by passing upon the credibility of said Rosa Cannon as a witness. Nor can an expert in insanity testify as an expert as to whether a witness is testifying truthfully or under delusion,—the jury are made the exclusive judges of this question. There was no testimony showing the amount of morphine or cocaine used by said Rosa Cannon during the time she had been using the same, and the question whether or not she had become insane by the excessive use of said drugs could not possibly throw any light upon defendant's condition. The expert, Dr. Worsham, testified fully in the abstract on this question; that is, he testified fully, as set out in the statement of facts, that the use of a certain amount of morphine and cocaine for a certain length of time would cause a person to have hallucinations and delusions of the character testified to by said witness Rosa Cannon, and to such persons these objects would be true and real. In offering said evidence, defendant's counsel did not state any purpose in view in offering same, nor suggest any relevancy that said evidence might have upon the case on trial." We do not think there was any error on the part of the court in refusing its introduction, because the bill fails to state the object and purpose for which this testimony was offered.

Bill number 21 complains that the court permitted Lee Stanford to testify that he was a juror in the Winfrey case, and heard Cannon testify in that case. Appellant objected on the ground that the purpose was to prejudice defendant by attempting to connect him with that trial in unfavorable aspects; that the testimony was in no respect material to the case; and that it was sought, further, to discredit defendant by showing he was a witness in the case, and that witness was a juror in said cause. The court's explanation is as follows: "It was shown that the trial of Fred Gann for killing Winfrey occurred a short time before the killing of Gray by defendant, and occurred during the time when defendant's testimony showed defendant's mind was

impaired or deranged, and that defendant testified as a witness in that case, and that Juror Stanford saw and heard defendant as such witness, and that from his appearance and testimony, as detailed by him to the jury in this case, he saw nothing unusual or strange in his appearance or conduct indicating his insanity, in witness' opinion, at the time of the trial of Gann." With this explanation, we think the testimony was harmless. Appellant had introduced various witnesses, who had testified to certain circumstances, and from these circumstances stated that, in their opinion, appellant was insane. Clearly, the State would have the right to rebut this testimony on the part of the defense by showing appellant had been a witness in an important trial just prior to the homicide.

Bill number 30 complains of the court's refusal to allow Spencer Ford, one of appellant's attorneys, to read to the jury, as part of his argument, extracts from the speech of Lord Erskine in the Hadfield case. The court qualifies the bill: "The court, upon objection of the State, refused to permit counsel for defendant to read the facts and arguments of Lord Erskine in the Hadfield case, or to recite from memory or otherwise, the facts in other insanity cases, historical or otherwise, or the opinion of the English courts or of Lord Erskine on said facts." We think the action of the trial court was clearly within his sound discretion, and there is no abuse of that discretion shown. This exact question was decided adversely to appellant's contention in Burt v. State, 38 Texas Criminal Reports, 397, 39 Lawyers' Reports Annotated, 305.

Bill number 29 was reserved to the refusal of the court to give the following special requested instructions, to wit:

"That a sufficient mental capacity to distinguish between right and wrong as to the particular act under investigation is not the only test of mental soundness or unsoundness, but it is further the law of this case, and you are so instructed, that if you find defendant killed deceased as charged in the indictment, but at the time of such killing the mind of defendant was so under the influence of morphine or cocaine, or morphine and whisky, or cocaine and whisky, or morphine, cocaine, and whisky, that he had not at the time sufficient mental capacity and will power to choose whether he would or would not kill deceased at the time he did kill him, and that defendant so killed deceased under such irresistible impulse, then you will acquit defendant, even though you may believe defendant was able to distinguish between right and wrong; and, if you have a reasonable doubt on this point, you will give defendant the benefit of such doubt," etc.

"If you believe from the evidence that defendant had ill will and malice against deceased, and that such ill will and malice was caused partly by defendant's belief that deceased was endeavoring to deprive him of his office of county school superintendent by the re-establishment of said office, and was also caused partly by a hallucination, illusion, or delusion on defendant's part that deceased was the head

of a mob who were trying to take his life or do him harm; that his wife was in communication with the mob and with deceased,—that is to say, if his mind was so disturbed at the time by a combination of said causes that he was incapable of calmly considering the act, and that in such state of mind he shot and killed deceased,—then defendant would be guilty of murder in the second degree."

"The jury are instructed that the inquiry in this case as to defendant's mental condition is confined to the very time of the alleged commission of the offense charged against defendant; and if you find that at such time he was mentally unsound, as heretofore defined, or if you have a reasonable doubt of his mental soundness at such time, you will find him not guilty, even though you should believe he was mentally sound just before and just after such time."

The court in his general charge to the jury gave the law applicable to murder in the first and second degrees, self-defense, and temporary insanity produced by the recent use of ardent spirits, as authorized by statute, and insanity produced by the recent and remote voluntary use of cocaine, producing complete temporary insanity. We have very carefully examined the court's charge, and believe the same covers all the law applicable to every phase of the evidence introduced upon the trial hereof, and the above copied charges, so far as applicable, were given in the general charge.

Appellant insists in his bill that the court erred in refusing to give the charge ordinarily denominated "a charge upon irresistible impulse." We are apprised of the fact that some supreme courts have upheld the doctrine of irresistible impulse as contained in appellant's charge, but we do not think this doctrine is sound. It has never been recognized as the law of this State. In Hurst v. State, 40 Texas Criminal Reports, 378, the majority of the court expressly disclaim any assent to the doctrine of irresistible impulse. If defendant has an irresistible impulse to commit a crime, and does not know the nature and quality of the act, he is insane. If he does know the nature and quality of the act, and does know right from wrong, and knows the act to be wrong, he is not insane. The charge as given is not conflicting, as contended by appellant, and the court did not err in refusing the special charge requested. Were it not for the length of this opinion, it would afford us pleasure to further discuss this question, but it is only necessary here to say that we do not think the court erred in failing to charge on the "doctrine of irresistible impulse," as contended by appellant.

Appellant excepts to the following portion of the court's charge: "You are further instructed that if you believe from the evidence in this case that defendant did shoot and kill W. A. Gray as alleged in the indictment herein, and that such killing was not done in his own necessary self-defense, but you further believe it has been shown by a preponderance of the evidence that at the time of the killing defendant, by the continued or recent use of morphine or cocaine or both, or by such use of either or both of said drugs, combined with whisky, or from

any other cause, except the voluntary recent use of ardent spirits alone, as heretofore explained to you, was rendered temporarily insane, and while in such state of insanity killed deceased, and that defendant's mind was at the time of such killing so affected with insanity that he did not understand the nature and quality and character of the act of killing deceased and its consequences, or if his mind at the time of such killing was in such diseased and unsound condition that for the time being his reason, conscience, and judgment was overwhelmed to such an extent that he did not know such act was wrong and criminal, and would subject him to punishment, or create in the mind of defendant an uncontrollable and irresistible impulse to kill deceased, which, because of such unsound condition of his mind, he had not sufficient reason, judgment, and will power to resist, then you will acquit defendant." This charge is correct, and is the law of this State. Leache v. State, 22 Texas Crim. App., 279; King v. State, 9 Texas Crim. App., 515.

Appellant furthermore contends that the court should have charged on the law of manslaughter. We do not think there is any evidence in this record raising that issue. In Weathersby v. State, 29 Texas Criminal Appeals, 278, the court said: "Where the party killed had given no provocation, was merely seeking to prevent the killing of another, the issue of manslaughter is not presented. In order to reduce a killing from murder in the first or second degree to manslaughter, passion must be aroused, and the killing must be caused directly by the passion aroused at the present provocation, and the provocation must be one given by the party killed, and not given by some other person. It is not every possible phase of the case that may be suggested by any testimony in the case that requires a charge of the court. The rule is settled in this court by Davis v. State, 28 Texas Criminal Appeals, 560, where we there say: 'Unless the evidence tending to present a less degree of offense be so pertinent and forcible that it may reasonably be supposed that the jury could be influenced by it in arriving at their verdict, the failure of the court to charge thereon would not be ground for reversal, in the absence of exception.'" And see also Maxwell v. State, 31 Texas Crim. Rep., 119. Recurring, now, to the facts above, we do not think there was any evidence authorizing the court to charge on manslaughter. The proof shows that appellant, with premeditated design, went to the house of deceased, and, standing at the gate, shot deceased while at his front steps, unarmed, and without any excuse whatever, unless he was crazy. The record does not show he was insane, but, on the other hand, we think it clearly establishes the fact that deceased was killed by defendant through cold, cruel, and premeditated design, and not under any temporary or permanent fit of insanity. We have carefully reviewed all of the assignments of error, bills of exception, and grounds of the motion for new trial, and find no error in the record such as requires a reversal of this case.

Before concluding this opinion, we avail ourselves of this opportunity

for expressing our thanks to appellant's counsel for their very able brief filed on the motion to strike out the statement of facts as well as upon the merits of the case, and also for the able and painstaking briefs of the Assistant Attorney-General. While the record is large and voluminous, we have received great assistance in our investigation of the mooted questions involved from their respective briefs. No reversible error appearing in the record, the judgment is in all things affirmed.

*Affirmed.*

HENDERSON, JUDGE.—I concur in the disposition of the case as made in the opinion of my Brother BROOKS, but do not agree to some of the reasons advanced, and especially I do not assent to that portion of the opinion which declares against that character of insanity known as "irresistible impulse." I expressed my views in Hurst v. State, 40 Texas Criminal Reports, 378, and I refer to what was there said. The learned judge who tried the case below appears to have concurred in this opinion, and to have aligned himself with the text-books and the current decisions on this question. It is said, however, that his charge on this subject is confusing, and that is the objection urged against it by appellant. I do not consider it. The charge fully and clearly announced the doctrine of irresistible impulse, as follows: "Whether the insanity be general or partial, whether fixed or periodical, the degree of it must have been sufficiently great to have controlled the will of the accused, and to have taken from him the freedom of moral action at the time of the commission of the act." And again: "If it is true defendant took the life of deceased, and at the time the mental and physical faculties were not under the control of defendant, or if some controlling mental or physical disease was in truth the acting power within him, which he could not resist, and he was impelled, without intent, reason, or purpose, he would not be accountable to the law." And again: "If the mind was in a diseased and unsound state, to such a degree that for the time being it overwhelmed the reason, conscience, and judgment, and the defendant in committing the crime acted from an irresistible and uncontrollable impulse, then it would be the act of the body, without the concurrence of the mind. In such case there would be the want of the necessary ingredient of every crime, the intent and purpose to commit it." True, in applying the law to the facts in one of the charges given, the judge coupled irresistible impulse with the capacity to know the right and wrong of the particular act, but in another charge he gave the law on this subject as follows, to wit: "If you further believe · * * * defendant, by the continued or recent use of morphine or cocaine, or both, or by the use of either of said drugs combined with whisky, or from any other cause, * * * as heretofore explained to you, was rendered temporarily insane, * * * which created in the mind of defendant an uncontrollable and irresistible impulse to kill deceased, which because of such unsound condition of his mind he had not suffi-

cient reason, judgment and will power to resist, then you will acquit defendant, and so state in your verdict." These charges I do not think were confusing. One was an enlargement merely of the other. In the one the jury were told that, if the party was insane to a degree that he did not know the right and wrong of the particular act at the time, he would be irresponsible. In the other they were instructed that if the insanity of defendant went to the extent of depriving him of all will power, and he was impelled by an uncontrollable and irresistible impulse to kill deceased, on account of such unsoundness of mind, then he would not be responsible. With these observations, I agree to the affirmance of the case.

DAVIDSON, PRESIDING JUDGE.—I concur in the result reached in this case. I dissent from that portion of the opinion which admits the statement of facts for consideration. The affidavit of Hon. R. E. Brooks, the district judge who sat during the trial, taken in connection with that of Hon. T. S. Henderson, of counsel for appellant, in my judgment clearly shows a want of diligence in the preparation and presentment of the statement of facts to the trial judge within the ten days allowed by the order of the court. These affidavits are set out in the original opinion. In addition to these, Hon. D. S. Chessher, county attorney of Williamson County, files an affidavit showing substantially that on Friday, after the adjournment of the District Court on the previous Saturday, by conversation over the telephone with Hon. T. S. Henderson, he urged an early preparation of the statement of facts. Henderson stated that Judge Ford (counsel for appellant) was then in Cameron, dictating the statement to the stenographer. Chessher requested that the portion of the statement already prepared be furnished him, but was told that none of it had at that time been written out, and that Judge Ford was then dictating it. He then asked Mr. Henderson when he thought he would get through, and the reply was, "By Monday." Affiant then notified counsel, in the same conversation, "that he did not know how they would have time to get through with said statement, and get same approved, and urged him to press the same." Chessher became uneasy about getting a full statement of the facts, and on the next day went to Franklin, in Robertson County, arriving there at 6 o'clock Saturday evening, August 19th. With the assistance of Judge Crawford, District Attorney Scott, and Judge Simmons, counsel for the State, they began the preparation of a statement of facts, in connection with two typewriters, and worked Saturday night until 12 o'clock, and Sunday, and part of Sunday night, and completed the statement. This, in connection of thirty pages, which had previously been prepared by Chessher, made out what he says was a full statement of the facts, and he further states "that this is as full as the statement presented by counsel for appellant." Upon his return to Georgetown (where the case was tried) he asked Judge Robertson of that place (counsel of appellant) if appellant's

statement had arrived, and was informed it had not, but he was look-ing for it on every train. Finally, the statement of facts prepared by appellant's counsel was called to his attention a little after 2 o'clock on August 22d. This was the last of the ten days allowed by the court. Chessher and Robertson then went over the statement of facts, in connection with the district attorney, Hon. Warren W. Moore, and at seven minutes to 12 o'clock that night agreed. It was then carried to the district judge, who states, under oath, that it was handed to him at three minutes to 12 o'clock. He refused to sign and approve it until he had inspected it, which the majority of the court hold was correct. Had counsel for appellant called upon the district judge to be present with the State's and defendant's counsel while they were going over the statement of facts, the same could have been approved by him at the time it was agreed upon. But this was not done. So, taking the whole matter together, it will be seen that appellant's counsel began dic-tating the statement of facts on Thursday, after the court had ad-journed on Saturday, and that this statement, when finally prepared, was sent on Monday, by express, to Georgetown, in Williamson County, to one of appellant's counsel, and was not presented to the judge until three minutes before the expiration of the ten days. I do not believe this is diligence, under the statute.

Under article 1382, Revised Civil Statutes, a statement of facts pre-pared under the ten days allowed for that purpose must be filed within that time, and the "failure to file same within said time must be shown not to be due to the fault or laches of the party or his attorney, and that such failure was the result of causes beyond his control." It is clear, from an inspection of the affidavits, that it was not beyond the control of appellant's counsel to file same in ten days. It was only about fifty miles by rail from Cameron to Georgetown. The statement of facts could have been in Georgetown on Monday evening before 7 o'clock by proper diligence, which would have given Monday night and all of Tuesday, to 12 o'clock at night, in which to have completed and approved said statement. But, back of that, there was a want of dili-gence in not preparing the statement of facts earlier. The statement, as prepared, had about 150 pages, to which were added a few pages by the trial judge. So far as I am aware, all of the decisions in all the appellate courts of this State, civil and criminal, have held strictly to the wording of the statute. If there is a contrary decision it has es-caped my attention. See George v. State, 25 Texas Crim. App., 229; Spencer v. State, 25 Texas Crim. App., 585; Farris v. State, 26 Texas Crim. App., 105; George v. State, 25 Texas Crim. App., 229; Aistrop v. State, 31 Texas Crim. Rep., 467; Bell v. State, 31 Texas Crim. Rep., 521; Kutch v. State, 32 Texas Crim. Rep., 184; Blackshire v. State, 33 Texas Crim. Rep., 160; Smith v. State, 33 Texas Crim. Rep., 569; Blain v. State, 34 Texas Crim. Rep., 417; Armstrong v. State, 34 Texas Crim. Rep., 642; Yungman v. State, 35 Texas Crim. Rep., 80; Bryant v. State, 35 Texas Crim. Rep., 394; Childers v. State, 36 Texas Crim.

Rep., 128; Henderson v. State, 37 Texas Crim. Rep., 79; Bonner v. State, 38 Texas Crim. Rep., 599; Monk v. State, 38 Texas Crim. Rep., 602; Dement v. State, 39 Texas Crim. Rep., 271; Davis v. State, 39 Texas Crim. Rep., 681; Bailey v. State (Texas Crim. App.), 53 S .W. Rep., 117; Dennis v. State, Id., 111; Bracy v. State (Texas Crim. App.), 49 S. W. Rep., 598; Johnson v. State (Texas Crim. App.), 38 S. W. Rep., 994; Ellis v. Cunningham, 16 Texas Civ. App., 572. Ellis v. Cunningham, supra, is strictly analogous to this case, as is Dennis v. State (Texas Crim. App.), 53 S. W. Rep., 111.

All the decisions agree that where the mails have been relied upon, and the party has failed thereby to secure a statement of facts, on account of some accident to or detention by the mails, it is a want of diligence, under article 1382. The opinion recognizes this, but relies upon the recent decision of the Court of Civil Appeals in Carothers v. Lange. That case has no application here. The court in that case permitted the filing of a transcript where the opposite party sought an affirmance on certificate, and held in regard to that matter that reasonable diligence was shown, and permitted the record to be filed. The statute under which this decision was made reads as follows (article 1015, Revised Civil Statutes): "In any appeal or writ of error as provided for in this chapter, the appellant or plaintiff in error shall file the transcript with the clerk of the courts of civil appeals within ninety days from the performance of the appeal or service of the writ of error: provided, that for good cause the court may permit the transcript to be thereafter filed upon such terms as it may prescribe." If article 1382 read as does this article, there would be some cogency in the contention of the majority. But under this latter article the court may permit transcripts to be filed for good cause and upon such terms as the court may prescribe. Under article 1382, appellant must show the failure to file the statement of facts arose from no fault on his part and from circumstances beyond his control. The difference between the statutes is plain, and the rule prescribed by one has no analogy to the other. I therefore dissent from the position of the majority that the rule laid down for the filing of transcripts is applicable to the rule prescribed for the filing of statements of facts. Carothers v. Lange, supra, has no application to article 1382.

Nor was there any more diligence in sending the statement of facts by express than by mail. In Blackburn v. Blackburn (Texas Civil Appeals), 42 Southwestern Reporter, 132, the Court of Civil Appeals sustain the proposition that it is not diligence to rely upon express companies. In that case, as in this, ten days were allowed after the adjournment in which to file the statement of facts, the tenth day being December 1st. It was filed on December 2d. So in this respect the cases are analogous. In that case the judge approved the statement of facts on the 27th or 28th day of November. It was completed at Pearsall; thence forwarded by express to Cotulla, addressed to the district clerk of La Salle County. It was shown to have been in the

office of the express company at Cotulla on the 28th—three days remaining of the ten days. At the time the package was expressed from Pearsall appellant's counsel wrote the district clerk notifying him of that fact, with the request if he did not receive it promptly to inform counsel at once, and, not hearing from the clerk, counsel believed it was on file, and did nothing more. The clerk received the letter on the 27th, called on the agent for the statement on that day, and was told that no such package was in his office. He did not notify counsel, nor did he call for the package again, believing an agreement had been made covering the delay. The express company did not notify the clerk the package had been received until December 2d. The court, citing article 1382, say: "This proposition clearly shows that the failure to file the statement in time must have resulted from a cause beyond the control of appellant or his counsel; in other words, that the greatest possible diligence is essential in such cases. That such diligence was the rule before the statute is decided in Proctor v. Wilcox, 68 Texas, 219. It seems to us that we are obliged to sustain this motion. The statement was ready for filing and in Cotulla three days before the ten days had expired. Appellant's counsel, after expressing the same, and writing the letters above referred to, did nothing more, but relied on the express company delivering it promptly, and upon the clerk notifying him if it had not reached him, and took the risk of these things. Certainly, this was not the exercise of the strictest diligence in the matter, and ample time and opportunity existed for knowing whether or not the statement had reached the hands of the clerk before the time expired. It can not be said, under the circumstances, that the cause was beyond the control of appellant. What was done would doubtless fulfill the measure of ordinary diligence, but not the strictest diligence." So it will be seen that the diligence is no more sufficient when the express company is relied upon than when the mail agencies of the government are invoked. In fact, in the opinion of the writer, it is greater diligence to use the governmental agencies for the transmitting of mailable matter than that of a private corporation. I therefore believe there was no such diligence used as required by the statute, either in the preparation or the transmission of the statement of facts or in getting it to the judge who tried the case for his approval. Nor do I believe the majority is correct in applying the provisions of article 1015 instead of article 1382. Article 1015 has absolutely no application to a statement of facts, nor does article 1382 have any to the filing of transcripts on appeal or writ of error. I therefore respectfully dissent from that portion of the opinion. I concur, however, in the result.

ON MOTION FOR REHEARING.

(March 23, 1900.)

BROOKS, JUDGE.—This case was affirmed at a previous day of this term, and now comes before us on motion for rehearing. Appellant insists upon two grounds for the granting of his motion for rehearing: (1) That the court erred in holding the action of the trial court was correct in refusing to permit Dr. Worsham to testify that Mrs. Rosa Cannon, wife of appellant, was subject to insane delusions; (2) the court erred in holding there was no manslaughter in this case.

We have carefully read appellant's motion, and his able brief and argument in support thereof, and are of opinion there no error in the previous holding of this court.

We note, as appellant states, we base the original opinion as to the testimony of Dr. Worsham in reference to Mrs. Rosa Cannon upon the fact that the bill fails to state the object and purpose for which this testimony was offered. Appellant strenuously insists that the bill does show such object and purpose. Conceding that his insistence is correct, still we do not think the testimony would have been admissible. The sanity or insanity of appellant's wife could not throw any light upon the mental status of appellant. The drugs and narcotics claimed to have been used by appellant's wife may have had a more injurious effect upon her mental condition than it did upon appellant, and we do not think it would be admissible to show that one person was insane from the use of drugs, and for that reason some other person was insane simply from the use of such drugs. This would be the case, even if the proof showed they used the same amount of drugs for the same length of time, and certainly this would be the rule where there is no proof as to the relative physical resistance of the different parties using the drugs as to the effect of such drugs. Furthermore, it would certainly be true, when there is no proof that they used the same amount of drugs or for the same length of time. Without elaborating upon the proposition, we believe that many of the reasons urged by the learned trial court for the exclusion of this testimony were correct.

The second ground of his motion is with reference to the issue of manslaughter being raised by the testimony. The evidence presents the issue of murder in the first or second degree, or insanity, as charged by the court. If appellant at the time he slew deceased was laboring under a delusion, and such delusion deprived him of the capacity to know right from wrong, he was insane. There is no grade of delusion that mitigates crime. In other words, a party can not be half insane. He is either sane or insane. As aptly said: "Insanity never operates as mitigation of a homicide, as it goes only to the punishment, and not to the character of the act itself; and its only effect is to exempt the slayer from the punishment prescribed for the homicide, without exonerating him from the charge of committing it." 9 Am. and Eng.

Enc. of Law, 615. The rule is stated in United States v. Lee, 54 American Decisions, 293, as follows: "That there is no grade of insanity sufficient to acquit of murder, but not of manslaughter; but above and beyond that the prayer is inconsistent with his, is incongruous, and radically vicious. It rests upon the idea there is a grade of insanity not sufficient to acquit the party of the crime of manslaughter, and yet sufficient to acquit him of the crime of murder. The law does not recognize any such discretion as that in the forms of insanity. The rule of law is very plain that, in order that the plea of insanity shall prevail, there must have been that mental condition of the party which disabled him from distinguishing between right and wrong in respect to the act committed." This is to say, in another way, that a person can not be half insane. Spencer v. State, 69 Md., 28, 13 Atl. Rep., 809; 3 Whitthaus & B. Med. Jur., p. 421. The motion for rehearing is accordingly overruled.

*Motion overruled.*

HENDERSON, JUDGE.—I concur in overruling the motion for rehearing, but not in some of the reasons presented.