## J. P. LANE v. THE STATE.

### No. 215.   Decided December 15, 1909.

### Rehearing denied June 15, 1910.

**1.—Murder—Continuance—Want of Diligence—Testimony not Probably True.**

Where, upon trial of murder, the application for continuance showed an utter want of any such diligence as the law requires to secure the testimony of the absent witness; that the affidavit of said absent witness was not attached to the motion for new trial and that the testimony was not probably true, there was no error in overruling the motion.

**2.—Same—Discretion of Court—Insanity.**

A large discretion must be vested in the trial court in matters of motions for continuance, and where all the testimony in the case showed that the defendant was not insane at the time of the homicide to the extent that would excuse him, there was no error in the court's action in overruling the application.

### 3.—Same—Evidence—Unconnected Incident.

Where, upon trial of murder, it appeared on appeal that some one had sent to the courtroom and placed on the attorney's table, in front of the jury who tried defendant, a coil of rope with a card attached saying that said rope was sent to aid the county in the escape of prisoners, but it was shown in the judge's explanation that said incident was not noticed by the jury or said message communicated to them, and the court had the same removed at once, there was no reversible error.

### 4.—Same—Practice—Contempt of Court.

Upon trial of murder, where it appeared from the record on appeal that the son-in-law of the defendant was instructed by the court to remain in attendance on account of having instructed a witness not to attend as a witness, and after the trial was fined for contempt; and it also appeared that during the examination by the court of this person the jurors heard the examination with reference to this person's action in keeping away the witness, but all answered that this would not influence their verdict, there was no reversible error.

### 5.—Same—Evidence—Insanity—Physical Examination of Defendant.

Upon trial of murder, while one of the defendant's witnesses was testifying as to the mental condition of defendant, and among other things said that defendant's eyes were unnatural and indicated insanity, whereupon State's counsel asked witness how defendant's eyes compared at the time of the trial with their condition at the time that was referred to, and witness, being an aged man with impaired eyesight, stepped up to the defendant and examined his eyes and stated that they did not indicate insanity then, there was no error.

### 6.—Same—Evidence—Dying Declarations—Res Gestae—Shorthand Facts.

Where, upon trial of murder, the State introduced the dying declarations of deceased which among other things stated that defendant always seemed to hate deceased because her mother looked up to deceased; that he did not like deceased to come home to her mother on a visit and always had it in for deceased, the same was res gestae and dying declarations and the shorthand rendering of the facts.

### 7.—Same—Evidence—Declarations by Defendant—Arrest—Motive.

Upon trial of murder there was no error in admitting in evidence the statements of the officer that some time before the homicide he arrested defendant for carrying a pistol and that defendant said that the deceased was a "damned bitch," who caused all of his trouble.

### 8.—Same—Evidence—Motive—Withdrawal of Evidence.

Where, upon trial of murder, the State in attempting to prove motive asked the State's witness whether the defendant ever worked anybody to which objection was made and sustained, and the jury instructed not to consider same, there was no error.

### 9.—Same—Evidence—Motive—Declarations of Defendant.

Upon trial of murder there was no error in admitting in evidence the testimony of the deputy constable that some time before the homicide while the officer had defendant in custody for carrying a pistol he declared that the deceased was the cause of the doings and that she ought to be killed.

### 10.—Same—Evidence—Insanity, Test of.

Upon trial of murder there was no error in rejecting testimony by one who was not an expert that the defendant did not have mental strength enough to design murder; as the test of lunacy is the knowledge of right and wrong.

### 11.—Same—Evidence—Impeaching Witness.

Upon trial of murder, where defendant's witness testified that he knew of no animosity on part of defendant against the deceased, it was legitimate for the State to lay a predicate for his impeachment.

**12.—Same—Evidence—Lunacy Commission.**

Upon trial of murder where a lunacy commission was appointed by the court upon the special instance of defendant, there was no error in permitting the members of said commission who were physicians to testify in rebuttal to the evidence of defendant's defense of insanity, that they had personally examined him, and that the defendant was sane at the time of the homicide.

**13.—Same—Evidence—Insanity.**

Upon trial of murder there was no error in permitting the jailer to testify that during defendant's custody he had frequently talked with him, and that he believed that he was sane; which testimony was also admitted in rebuttal.

**14.—Same—Argument of Counsel—Bill of Exceptions.**

Where, upon appeal from a conviction of murder, the bill of exceptions did not show that the court certified to the objectionable language of State's counsel, the same could not be considered.

**15.—Same—Argument of Counsel.**

Where, upon appeal from a conviction of murder, the record did not show that the court certified to the truth of the objection to State's counsel argument to the effect that stepparents and stepchildren frequently fell out with each other, the same could not be considered.

**16.—Same—Courthouse—Place of Holding Court—Commissioners' Court—Grand Jury.**

Where, upon appeal from a conviction of murder, the record showed that the court and grand jury sat at a place properly designated by law during the finding of the indictment and the trial of the case, and that the Commissioners' Court had properly provided for said place of holding the court, the appellant's exception that the indictment was not found and the trial not had at a place designated by law was untenable.

Appeal from the District Court of Navarro. Tried below before the Hon. H. B. Daviss.

Appeal from a conviction of murder in the first degree; penalty, life imprisonment in the penitentiary.

The following are the dying declarations of deceased: "I, Mrs. Belle Nix, make this statement voluntarily; I feel that I am going to die—feel like I am nearly dead now—and do not have any hope of getting well.

"Early Sunday morning Mr. Lane came in the back door and sat down in the kitchen, and sat there while I cooked breakfast, talking about coming back. Campbell, my little nephew, took me off in the front room and says, 'Aunt Belle, he has a pistol;' that he had seen it. I went in and asked Mr. Lane if he had a pistol, and he says, 'Yes, I have got one but it ain't loaded,' and he kept staying, and mama asked him to sit down to breakfast, and he did so; mama and he ate in the dining-room and Campbell and I ate in the kitchen; he was begging while eating to be taken back, that is, begging mother to give him another trial, and she told him no; she couldn't stand him any longer, that she had tried him nearly eight years and he had nearly put her in her grave. Mama went in her room to get ready for Sunday-School, and he came in the kitchen where I was washing dishes. He commenced begging me to beg mama to take him back, and I says, 'I haven't anything to do with it.' And I

asked him, what made him say he was going to kill me when he got out of jail? and he says, 'Do you think really I would do that, Belle?' And I says, 'Yes, I think you would if you had a good chance;' but I did not feel uneasy then, for he had said his pistol was not loaded.

"I went into the room where mama was dressing and commenced to curl my hair for Sunday-School, and Campbell, mama and I had all been in same room with him most of the time, and he sent Campbell out of doors for his grip and walking stick and said he would go. We thought he was going. I was standing before the dresser in mama's room with my back to him, and he had just stepped outside in the hall right at the door, and mama walked across the hall into the dining-room, and just as soon as she did he shot me in the back. I was curling my hair when he shot me and my back was to him; he was about two yards from me when he shot me; if he said anything when he shot I never heard him. I only had curling irons in my hand when he shot me, and never had any idea he was going to hurt me when he did. I fell on the floor backwards and then he shot at mother and Campbell. I hollered at mama to run. He always seemed to hate me because mama looked up to me; he did not seem to like for me to come home on a visit, and always had it in for me. He said he did not sleep any the night before. He was drinking but not drunk."

It was also shown by the State's testimony that the deceased was the stepdaughter of the defendant; that she was a school teacher, and came from time to time to visit her mother, with whom she spent most of her life. Other essential facts appear in the opinion.

*McClellan & Prince,* for appellant.—Upon question of continuance: Phillips v. State, 35 Texas Crim. Rep., 480.

On question of dying declarations: Williams v. State, 51 S. W. Rep., 220; Winfrey v. State, 56 S. W. Rep., 919; Bateson v. State, 46 Texas Crim. Rep., 34.

Upon admission of declarations of defendant while under arrest: White's Code Crim. Procedure, art. 790; McIlwaine's Pocket Digest, art. 796.

Upon question of rejecting testimony as to defendant's capacity of carrying out design: Holcomb v. State, 41 Texas, 125; Thomas v. State, 40 Texas, 60; McClackey v. State, 5 Texas Crim. App., 320; Webb v. State, 5 Texas Crim. App., 596.

On question of impeaching defendant's witness: Exom v. State, 33 Texas Crim. Rep., 461.

Upon question of holding court at a place not designated by law: Baldwin v. Travis Co., 88 S. W. Rep., 480; Wheeler v. Wheeler, 76 Texas, 489; Steele v. State, 19 Texas Crim. App., 425.

*John A. Mobley,* Assistant Attorney-General, and *Luther A. John-*

*son.*—District Attorney, for the State.—Since the burden of proof is upon the defendant to establish the fact of insanity in the face of this record with such an overwhelming mass of testimony establishing clearly the sanity of defendant, is this court authorized to say that the trial court did not exercise a sound discretion in saying that the testimony of said absent witness was not probably true, and that if said witness had been present said testimony would have caused or affected the verdict rendered in this case? Land v. State, 34 Texas Crim. Rep., 330; Gallagher v. State, 34 Texas Crim. Rep., 306; Easterwood v. State, 34 Texas Crim. Rep., 400; Bluman v. State, 33 Texas Crim. Rep., 43; Goldsmith v. State, 32 Texas Crim. Rep., 112; Holley v. State, 49 Texas Crim. Rep., 306, 92 S. W. Rep., 422.

BROOKS, Judge.—Appellant was convicted of murder in the first degree, and his punishment assessed at life imprisonment in the penitentiary.

1. Bill of exceptions No. 1 was reserved to the action of the court in refusing first application for continuance for want of the testimony of Mrs. Freda Roberts, by whom defendant expected to prove that he was at witness' house for a week or more just preceding the homicide, and that during such time she had ample opportunity to observe defendant's actions, and that his actions were as set out in defendant's application for continuance, and showed his lunacy. Defendant's counsel was not aware of the materiality of said witness' testimony until the day the application for continuance was made, and too late to issue process to compel her attendance, and furthermore, if process had been issued, witness' attendance could not have been procured because of her serious sickness, she being confined to her bed following a surgical operation, and physically unable to appear in court as shown by doctor's certificate. On materiality appellant suggests the following: Because said witness was material as an eyewitness to the conduct of defendant tending to prove his lunacy, which was the sole defense in this case, and the facts expected to be proven by such witness immediately preceded the killing, and said witness had opportunity to observe fully his conduct and actions during defendant's stay in Houston, Texas, which immediately preceded the killing on the return to Corsicana, and the court overruled the application with this explanation: "That there was absolutely no diligence shown on part of defendant to secure this witness. No process of any kind was asked for or issued for witness. And, in view of the evidence developed upon the trial of the case the facts sought to be proved are not probably true." In the first place, the application does not affirmatively show what was expected to be proved by the witness. The application shows a mere conclusion in that it says that the witness had noted the conduct of the defendant tending to prove his lunacy. What it was or what she would swear to that tended to prove it is

not shown in the application. Furthermore, the testimony is not probably true, as suggested by the court, in the light of this record, since the same shows a cruel and wanton killing by a party who was thoroughly possessed of all of his senses, and there is scarcely a suspicion raised by legal evidence to the contrary.

2. Bill of exceptions No. 2 shows that appellant complains that someone had sent to the courtroom and placed on the attorneys' table and in front of the jury and in their full view a coil of rope, with a card attached thereto from the sender, on which was written a message to the effect that said rope was sent for the purpose of aiding the county of Navarro in the escape of those confined in jail. That the defendant was and had been confined in jail without bond on the charge of murdering Mrs. Belle Nix, a woman, and the only conclusion that could be drawn from the sending of said rope, and from the rope itself, was that the jury in the case was urged to bring in a verdict of guilty with the death penalty, and the only effect said message and said rope could have was that it prejudiced the defendant's case with the jury and created a subconscious belief that the public were clamoring for a verdict of death. The court appends to the bill of exceptions this qualification: "The facts of this incident are as follows: Rev. Mulkey (who charges himself with being a huge practical joker, and the court thinks he really believes the charge to be true), intending to perpetrate a practical joke upon the county judge and county Commissioners Court, because of recent escapes from the jail of Navarro County by prisoners by means of blankets, which they tore into strips and tied together to let themselves down out of the upper story of the jail, procured a coil of rope, prepared and attached to the rope a neat card, on which was written these words: 'To the County Court of Navarro County. An Escape For The Jail. Compliment of ABE MULKEY, A Humanitarian.' This rope, thus tagged, Rev. Mulkey placed in the hands of a negro man, with instructions to carry it to the County Court room, and lay it at the feet of the county judge, without explanation. The County Court room and the District Court room were adjoining, being only separated by a brick wall. The negro brought the rope into the District Court room by mistake, and placed it on the table used by attorneys in front of the jury and reasonably near to them and to the defendant, J. P. Lane. Nothing was said. As soon as the rope was discovered, the court in an undertone ordered the sheriff to get the rope and bring it to the court's desk, and to attract no one's attention in doing so. The sheriff obeyed and attracted no one's attention that I could observe. I think very few noticed the incident, and no comment was made upon it that I ever heard of. If it was even noticed by the jury, the court is not aware of it, and the court knows that the jury never saw or knew of the message written upon the card.

"The court with some pleasure disavows entire responsibility for

any action of the Rev. Abe ——, and particularly for this caper. Surely the incident complained of did not outweigh the overwhelming evidence of defendant's guilt produced upon this trial, and become the means of influencing and procuring the jury to convict the defendant. Surely this verdict is founded upon the sound, yet lenient, judgment of the jury when considering of the evidence adduced before them on this trial, rather than upon the incident referred to."

Under the explanation of the court we do not believe there was any prejudicial error presented by this matter, nor do we think the matter ever reached the offensive phase suggested by the bill of exceptions.

3. Bill of exceptions No. 3 shows the veniremen in the cause were in court and heard the application for a continuance made by defendant on account of the absence of the witnesses, Max Roberts and Freda Roberts, and also heard what transpired as hereafter detailed. Upon presenting the application for continuance on account of the absence of said witnesses, the court announced he would communicate with the sheriff of Harris County, where said witnesses resided to see if the attendance of said witnesses could be procured, whereupon M. Dorenfield, a son-in-law of defendant, left the courtroom and communicated by long distance phone with Max Roberts, one of said witnesses, and returned into court and stated to his wife, who was defendant's daughter, according to the contention of the State, but contrary to his own "that the case would be continued, because he had instructed said witness not to attend," which statement was overheard by one of the attorneys for the State prosecuting the cause, and thereupon in the presence of the veniremen, from which the jury in the case was afterwards chosen, the said M. Dorenfield was put upon the stand and questions were propounded to him attempting to elicit from him an admission that he had instructed said Max Roberts not to attend as a witness, all of which he denied, but stated he had only inquired for the benefit of his wife, who was sick, whether said witness was able to attend court, nevertheless the court announced to him he must remain in court and must report therein on the following morning, thereby virtually putting him under arrest, and thereby indicating that said Dorenfield was interfering with the administration of justice in the case and thereby prejudicing defendant's cause by indicating his son-in-law was interfering with the administration of justice therein, and thereby compelling defendant to answer for the illegal act, if any, of his son-in-law, which tends to deprive and did deprive defendant of an impartial trial. This bill is approved with this explanation: "The incident of Dorenfield's conduct attracted very little attention. Every single veniremen and juror examined by the defendant's counsel, and accepted in the case, in fact, swore, in response to the direct question, that the incident of the conduct of Dorenfield and his

examination with reference thereto did not influence and would not influence him, and each such juror expressly declared upon his oath at that time that such incident and examination would be by him entirely eliminated from the trial of the case. Both the court and others present preserved a written note of the testimony of each juror, as above detailed, and the fact of their so testifying will not be disputed by the defendant or his counsel. That the examination of Dorenfield took place at a time when the court was at ease and before the motion for continuance was overruled. No remark nor any conduct of the court, at the time, could have been construed into an arrest of Dorenfield. The court took particular pains not to let any idea of what course would be taken with reference to Dorenfield's conduct become known. Without show of feeling or displeasure the court requested Dorenfield to remain in the court until he was discharged. Dorenfield went and came as he pleased during the further progress of the trial. And not until the case was ended, and the verdict was actually rendered, did anybody know that the court proposed to punish Dorenfield for contempt." This bill shows that appellant sought a continuance for Max Roberts and his wife, whereas the bill of exceptions reserved to the overruling of application for continuance merely relates to the wife. We note from an examination of the record that Max Roberts testified. Now, reverting to the bill, we will say, it presents no matter authorizing a reversal of this case. The parties were examined upon their voir dire with relation to the incident, and the party was not fined until after the trial was over. The jurors all answered it would not influence them in making up a verdict under this sworn statement of theirs. Appellant took them upon the trial of this case. This being the condition, we do not think there was any error suggested.

4. Bill of exceptions No. 4 shows that while the witness J. W. Scott, for the defense, was testifying as to the mental condition of appellant, on cross-examination by the State, he was asked how he determined defendant's insanity, and, among other things, said, because his eyes were contracted, unnatural and indicated insanity, whereupon the State caused him to examine, in the presence of the jury, defendant's eyes, and state whether or not they were then in the same condition as they were when he had examined them before, whereupon said witness testified defendant's eyes did not now indicate insanity as they had done at other times when he had observed them out of the courthouse and prior to the killing. Appellant objected to this procedure on the ground that it was compelling defendant to testify against himself; because the mental condition of defendant at the trial would not establish his lunacy at the time of the homicide. The court approves this bill with this statement: "Witness Scott was introduced by defendant, and testified that one reason why he thought defendant's mind was not right was because upon one occasion witness noticed the pupils of his eyes were con-

tracted. State's counsel asked witness how defendant's eyes compared at the time of trial with their condition at the time he referred to. Witness being an aged man and his own eyesight being impaired, he had to go to defendant in order to see clearly. It was under this condition of circumstances that witness was permitted to examine the eyes of the defendant." This question was decided against appellant in the case of Burt v. State, 38 Texas Crim. Rep., 397; also Tubb v. State, 55 Texas Cr. Rep., 606. There this court held that the demeanor and appearance of the defendant during the trial can be proven as a circumstance to indicate his sanity or insanity. This proposition of law has been also reannounced by this court since the rendition of the above cited case.

5. Bill of exceptions No. 5 shows the State offered the dying declarations of Mrs. Belle Nix, the person killed by appellant, and appellant objected to the following statement therein, to wit: "He always seemed to hate me because mamma looked up to me. He did not like for me to come home on a visit, and always had it in for me." Counsel for appellant objected, first, because such statement did not go to facts res gestae, but was a recital of facts not connected with the killing; second, because such statement was a conclusion of the witness; and, third, because such character of testimony can not be proved by a dying declaration when defendant has no power to cross-examine, but same is an ex parte statement of pre-existing matters arising prior to the homicide, and formed no part of the facts of the killing. All dying declarations are ex parte, and very seldom is the defendant authorized to cross-examine. A dying declaration usually occurs when the defendant is not present. The statement is certainly part of the res gestae of the facts stated, and is certainly not a conclusion of the witness that is precluded from being testified to. If this witness had been living she certainly could have given the reason why appellant shot her. If this witness had stated that appellant shot her because he was jealous of her mother's love for the witness or that appellant killed her because the mother loved deceased better than she did appellant, this could be criticised on the ground of being a conclusion as well as the statement made by the witness. This court has held where the deceased in a dying declaration states, "He killed me for nothing," that said statement is admissible. Then clearly the above statement is equally admissible. To say that the defendant killed the deceased for nothing is a conclusion from pre-existing facts. This could not be construed as being more than a conclusion from pre-existing facts, or, as the books frequently put it, a shorthand rendering of the facts. We do not think that the court erred in admitting this portion of the dying declaration.

6. Bill of exceptions No. 6 shows the State proved by E. N. Hanks that he was deputy sheriff, and had appellant under arrest for carrying a pistol, and had taken him before a justice of the peace,

and while defendant was under arrest and in custody of the Justice Court, and in charge of said E. N. Hanks, defendant said: "Miss Belle (meaning Mrs. Belle Nix, whom he afterwards killed), the damn bitch, was the cause of all this trouble." Appellant objected to the statement because the defendant was under arrest, and had not been warned. The court overruled the objection, and the bill is approved with this statement by the court: "The incident testified to by witness Hanks occurred some weeks prior to the crime charged in this case. Defendant was under arrest for carrying a pistol, and was in the Justice Court room; and the pistol carrying charge had been disposed of by defendant pleading guilty to a disturbance of the peace in said Justice Court; there being evidence that the defendant had just bought the pistol and was carrying it home. The testimony was material and pertinent on the issue of motive for the killing." As we understand this explanation appellant was not under arrest, but had pleaded guilty and been discharged at the time the statement was made that appellant complained of. Furthermore, the testimony was admissible to prove motive for the homicide, even if appellant was under arrest.

7. Bill of exceptions No. 7 shows that the State introduced J. T. Redden, and was attempting to prove by said witness that the motive which inspired defendant to kill Mrs. Belle Nix was because defendant was indolent and worthless and wanted his wife to sell her property and turn over the money to him, and Mrs. Belle Nix was using her influence against this course, which enraged defendant, and during the examination of said witness, after asking him if defendant had a business or worked anywhere, and receiving a negative answer, State's counsel then asked said witness, "Did defendant ever work anybody?" to which counsel for appellant objected for the following reasons: First, because said question tended to elicit facts that were inadmissible; second, because said question was asked for the sole purpose of bringing defendant into disrepute before the jury upon matters not connected with the trial and thereby prejudice him in the minds of the jury; and, third, because the court failed to reprimand the State's attorney or to instruct the jury to not consider same. This bill is signed with this explanation: "The question when asked by State's counsel was objected to by defendant, and the objection was sustained by the court. The witness did not answer the question, and the court at the instance of defendant's counsel instructed the jury not to consider the fact that the question was asked by State's counsel." This was all that could be done in the premises by the court to protect appellant's rights, and we do not think there was any error authorizing a reversal of this case in asking the question.

8. Bill of exceptions No. 8 shows the State proved by the witness John Nutt that he was a policeman, and had defendant under arrest for carrying a pistol, and that he turned him over to Deputy Con-

stable E. N. Hanks, and that while witness had custody of defendant the latter stated to him: "That was Belle's doings (meaning Mrs. Belle Nix, whom he afterwards killed); damn her, she ought to be killed." This testimony was admissible as indicated above.

9. Bill of exceptions No. 9 shows that appellant offered to prove by the witness McIlvany that he had known the defendant fifteen or sixteen years, and had had more or less intimate knowledge of him for the last three or four years, and that from such knowledge he did not believe defendant could think consecutively, and that he did not think defendant had mental strength enough to form and plan a design to take life and carry same out, and that said witness McIlvany, if permitted by the court, would have so testified, to which counsel for the State objected for the following reason, to wit: Because the test of lunacy was the knowledge of right and wrong, and that if such knowledge was possessed by defendant he would be guilty of murder in the first degree if the facts premeditation and design and malice could be proven, notwithstanding defendant's weak mental condition incapacitating him to make and carry out a plan. The court signs the bill with the statement that witness was not a doctor, nor expert in diseases of the mind. And question was leading, and also called for expert opinion. We think the ruling of the court was correct.

10. Bill of exceptions No. 10 shows the State sought to impeach the witness T. P. Little while on the stand at defendant's instance by laying the predicate so to do by asking him questions to show that he had called Melvin Weaver and Dora Jackson aside at different times, both of whom were connected by marriage with Mrs. Belle Nix, whom defendant killed, and told each of them he had been a witness on the trial of defendant for insanity, and had sworn on the stand on that trial he had never heard defendant say anything derogatory to Mrs. Belle Nix, deceased, but in truth and in fact he had heard him so say, but would go to jail before he would so testify because of his personal regard for said Weaver and said Jackson. Appellant objected to this effort on the part of the State, because by such evidence the State was attempting to prove the substantial facts that defendant had made derogatory remarks about Mrs. Belle Nix, whom defendant afterwards killed, to furnish a motive for his acts, and such substantial facts could not be proven by impeachment of a witness; and because such evidence was immaterial and was introduced only to prejudice defendant with the jury, and the court overruled the objections, and appellant excepted. This bill is approved with this statement: "Witness Little was placed on the witness stand by defendant, and had testified in his behalf, and also that he knew of no animosity on part of defendant against deceased. State's counsel asked him if he had not told the witnesses Weaver and Jackson that he did know of such feeling on the part of defendant against deceased, but he would go to jail rather than

tell it on this trial. The witness Little admitted that he had told each of the parties the statement attributed to him. The issue of whether there was motive for the killing was material, and particularly so in view of the defense of insanity, which was defendant's defense in this case. Hence, it was legitimate for the State to impeach the witness' testimony if it could do so; and the question was proper to lay predicate for such impeachment." We think, under the explanation of the court, the ruling was correct.

11. Bill of exceptions No. 11 shows that the State was permitted to prove by several doctors that they were appointed as a lunacy commission by the District Court of Navarro County, during the pendency of this trial to examine the defendant as to his mental condition, and that acting under such appointment they proceeded to the county jail of Navarro County, in which defendant was held without bond and by observation, and by question and answer put defendant through an examination lasting about two hours, and from such observation and from the answers made by defendant to their questions they believed defendant was sane, to which counsel for defendant objected, because defendant was under arrest at the time, and by appointment of the court each of said witnesses became an officer of the court, and the defendant had not been warned before or during his examination that his answer would be used against him. This bill is approved with this statement by the court: "When this case was called for trial the defendant demanded that he be first tried on the issue of his sanity or insanity. This was done, and the jury returned a verdict that he was sane. Defendant by proper motion in writing prayed the court to appoint a lunacy committee, to be composed of three of the most eminent physicians in Navarro County, to inquire into and report upon the question of his sanity. This request was granted, and Dr. Fryar, Dr. Suttle and Dr. Kelton were named, and committee thus formed was submitted to defendant's counsel for approval, and approved by both defendant and State's counsel. Then the lunacy committee was appointed, sworn and instructed to proceed as they saw fit, make such investigation as they deemed wise and proper, to take whatever time for their investigations they wished, and when their labors were completed, to report their findings to the court. Each of these doctors were permitted to testify, in rebuttal to the evidence of defendant's defense of insanity, that he had personally examined defendant, talked to him at length, ascertained all they could about his mental condition, etc., and swore that defendant was sane at the time of the killing of deceased. Neither was permitted to repeat any statement made to him by the defendant. The court then instructed the jury that this evidence could be considered by them only upon the issue of the sanity or insanity of defendant. This testimony was clearly admissible. Cannon v. State, 41 Texas Cr. Rep., 467.

12. Bill of exceptions No. 12 shows that John Curington, the

jailer of Navarro County, was permitted to testify that during appellant's custody in the jail he had frequently talked with him, and from such he believed defendant was sane. This bill is approved with this explanation: "Witness Curington was only introduced in rebuttal to defendant's defense of insanity, and permitted only to testify that he had known defendant and seen and talked with him every day since the date of the homicide, and to give his opinion that defendant was sane. He did not repeat any statement of the defendant." This testimony was admissible.

13. Bill of exceptions No. 13 shows that appellant complains of the following argument of the district attorney: "Gentlemen of the jury: The defendant is old, but this is not the first time an aged defendant has been brought into this court. Within the last year an old man whose hair was gray with age was tried and convicted in this court. His gray hair did not save him." Appellant further states in the bill, that within the last year old man Hart was convicted in the District Court of Navarro County for rape upon a girl under age, and sent to the penitentiary for life, and said cause was removed from Limestone County to Navarro County for trial and had wide publicity, and said language was prejudicial to a fair and impartial trial for this defendant, and was calculated to inflame and unduly arouse the minds of the jury, to set up a convicted man's punishment as the criterion to govern the jury. The bill is approved with this statement: "The court was writing his charge and did not hear the remark, if made by district attorney. Defendant's counsel never prepared instructions or request to have statement withdrawn from jury, and called the court's attention to it first in motion for new trial. Beside, defendant's defense was insanity and his old age; was not this legitimate answer to 'old age argument' for State's counsel to press for the consideration of the jury?" We do not think the statement of the district attorney was legitimate answer to the old age argument. The fact that some other old man may have been convicted is no predicate for the conviction of this man, nor ought said fact to have been alluded to, but as we understand the bill of exceptions, the court does not certify that the statement was made. In the absence of bill of exceptions properly certified to this effect, we could not reverse this case, even if it otherwise authorized same.

14. Bill of exceptions No. 14 shows that the district attorney used this language: "It is not infrequently the case that stepparents and stepchildren fall out and become enraged at each other. At this term of the court there was a case tried where the stepson had fallen out with his stepfather and imagined that his stepfather had it in for him and was working against him." This bill of exceptions is approved with the same qualification as bill No. 13.

15. Bill of exceptions No. 15 shows that the trial of the above cause was held in a certain store building on Beaton Street, in

Corsicana, and not at the courthouse thereof, to which counsel for appellant objected for the following reasons: First, because the orders of the Commissioners Court of Navarro County are insufficient in law to legally constitute said store building the proper place to hold court, and all orders pertaining thereto are void; second, because said storehouse was designated by a committee, and not by the Commissioners Court; and, third, because the Commissioners Court failed to designate any place for the grand jury to hold its sessions, and said grand jury held its session in a different building from that designated for a courthouse and found the bill against defendant in this case while holding its sessions in such different building. The court, in approving this bill, says: "The question was raised for first time on motion for new trial. The court finds that the order of the Commissioners Court, dated March —, 1909, did properly designate and establish the courthouse of Navarro County, and the place for the holding of the terms of the District and County Courts of Navarro County pending the repairs upon the regular courthouse of Navarro County; said designation was not the act of any committee, but the act of the Commissioners Court of Navarro County, Texas.

"The court further finds that said orders of said Commissioners Court are not void as claimed by defendant, because same are not signed by county judge and attested by county clerk of Navarro County, for the reason that this question has been repeatedly decided against that contention. See Brown v. Ruse, 69 Texas, 589; Ewing v. Duncan, 81 Texas 230; Lillard v. State, 53 S. W., 125; Coker v. State, 53 S. W., 1117; Roper v. Scurlock, 69 S. W., 456; Davidson v. State, 44 Texas Crim. Rep., 586, 73 S. W., 808, etc.

"The court further finds that the county Commissioners Court of Navarro County, and the sheriff of Navarro County, designated the place for the grand jury to hold its sessions, and provided it properly for that purpose. Every bill of indictment found by said grand jury, and the particular indictment against the defendant in this case found by said grand jury, was presented in open court, in the District Court room of Navarro County, Texas, with a quorum present. And that said room so designated and provided and furnished to said grand jury, was the most convenient and suitable for their use to be had." We hold that appellant's bill of exceptions is not meritorious, and the court and grand jury sat at a place properly designated by law. Appended to the bill of exceptions is the order of the Commissioners Court, which is in due and proper form as suggested by the court. We do not deem it necessary to copy same.

The evidence in this case clearly supports the verdict. The charge of the court is a proper presentation of all the law applicable to the facts of this case.

Finding no error in the record, the judgment is affirmed.

*Affirmed.*

ON REHEARING.

June 15, 1910.

RAMSEY, JUDGE.—In the original opinion prepared in this case the following statement was made: "In the first place the application does not affirmatively show what was expected to be proved by the witness. The application shows a mere conclusion in that it says that the witness had noted the conduct of the defendant tending to prove his lunacy. What it was or what she would swear to that tended to prove it is not shown in the application." The correctness of this statement is challenged, and we find on a more careful examination of the record that the statement made in the opinion is not entirely accurate. It is averred in the application that: "Defendant was an inmate of the house of Max Roberts, in Houston, Texas, and was constantly for said time, both day and night, under the espionage of said Max Roberts and his wife, Freda Roberts, and that they daily and nightly watched and observed the defendant and knew that his mind was shattered and that he was insane and non compos mentis up till the time and during all of the three weeks that he was at their house in Houston as aforesaid, and up till the Thursday before the killing, when he left said Max Roberts' house, and left the town of Houston and came to Navarro County, under the advice of the said Max Roberts and his said wife, Freda Roberts, to try to get a reconciliation with his wife and family, and to seek medical advice for his mental and physical condition. That said witnesses will establish the fact that all during his stay at their house as aforesaid that he would not or could not sleep; that his room adjoined the room of these witnesses and that he would walk the floor all night long, and that he would kneel and frequently pray during the night, and would incoherently mumble strange statements, strike his head against the wall and cry and hallo constantly, and his actions were such as to show that his mind was unbalanced, such as to render him incapable of any reasonable action or of forming any designs and shows that he was suffering from some insane delusion and that he was in this condition when he left Houston, as aforesaid, either on Wednesday or Thursday night, just preceding the killing."

As stated in the original opinion, there was, we think, an utter want of any such diligence as the law requires to secure the testimony of Mrs. Roberts. It should be noted further that no process of any kind was issued or applied for in respect to Mrs. Roberts until the case was called for trial. This lack of diligence is sought to be explained and nullified on account of appellant's mental condition, he being unable, as it is averred, to inform his attorneys as to the

Vol. LIX. Crim.—39.

witnesses he needed. If information had reached them of the nature of the testimony of Max Roberts, it would seem that reflection must have suggested that his wife would have had the same or similar opportunities for observing appellant. Besides, if in a case where insanity is a defense diligence may not be required of those representing him, it would result in innumerable continuances, and this would be true in cases where appellant was feigning insanity, as was contended by the State in this case, which contention finds large support in the record. It should be noted further that the affidavit of Mrs. Roberts is not attached to motion for new trial, and it does not distinctly appear what her testimony would be touching this matter. The trial court in approving the bill of exceptions concluded that the testimony expected to be given by this witness was not probably true. While this finding might not be conclusive upon us, in the absence of affidavit by witness as to what her testimony would be, and in view of the fact that the testimony of her husband does not fully meet the proof expected to be adduced through him, we are scarcely prepared to disregard this explanation and statement of the trial court. Again, it is undoubtedly true that a large discretion must be and is by law vested in the trial court in respect to matters of this sort, and ordinarily this discretion is not the subject of review unless in a particular case it is shown to have been abused or to have been exercised without due regard to the facts. In this case not a witness for defendant testified that he was insane to the extent that would excuse him for a violation of the law. More than a score of witnesses on the contrary testified for the State that he was sane and able to judge the character and quality of his act. The commission of physicians appointed by the trial court at the instance and request of appellant unanimously reported and testified that he was sane. His neighbors and those who had known him for many years testified to the same effect. The evidence offered in his behalf barely raises a suspicion to the contrary. A majority of those testifying for him described him merely as being nervous; that he appeared to have a "soft spot," to be "cranky," and kindred expressions, but as we read the record not one of them testified positively that even in his opinion that he did not know at the time of the killing or at any other time right from wrong. In view of the testimony of numerous witnesses who saw appellant after he left Houston and at the home of Mrs. Roberts and had come to Corsicana just before the killing, who testified in their opinion that appellant was sane and there was nothing strange or unusual in his conduct except one or two of said witnesses speak of his being under the influence of liquor, which from the record seems unfortunately to have been too common with him, would well justify the court below and would well justify us in concluding that the testimony of Mrs. Roberts, as stated in its entirety in the application, was probably not true. Considering all these matters in connection with the un-

questioned rule often stated and well·established that we should not and would not reverse a judgment on account of the refusal of an application for continuance unless in cases that by all the evidence adduced on the trial we are impressed with the conviction that the defendant might probably have been prejudiced in his rights by such ruling, and that it was reasonably probable that if the absent testimony had been before the jury a verdict more favorable to defendant would have resulted. See Sweeney v. State, decided at present term; O'Hara v. State, 57 Texas Crim. Rep., 577, 124 S. W., 95; Land v. State, 34 Texas Crim. Rep., 330; Gallagher v. State, 34 Texas Crim. Rep., 306; Easterwood v. State, 34 Texas Crim. Rep., 400; Bluman v. State, 33 Texas Crim. Rep., 43; Goldsmith v. State, 32 Texas Crim. Rep., 112; Holley v. State, 49 Texas Crim. Rep., 306, 92 S. W. Rep., 422.

We see no occasion to review or discuss the other questions treated in the opinion. We naturally feel a sympathy for appellant, notwithstanding the horror of his deed. His gray hair and old age appeal to us most strongly, but we can only administer the law without regard to persons.

Believing that the conclusion arrived at in the original opinion is correct, the motion for rehearing is overruled.

*Overruled.*

Davidson, Presiding Judge, and Thomas B. Love, Special Judge, concur.