JOHN KIRBY v. THE STATE.

No. 1822.  Decided June 19, 1912.

Rehearing denied October 30, 1912.

1.—**Murder—Evidence—Husband and Wife—Cross-Examination.**

Where defendant had brought out the circumstances bearing on the condition of his mind, there was no error in permitting defendant's wife, on cross-examination, to state that defendant was mad and mean.

**2.—Same—Continuance—Discretion of Court.**

An application for continuance is a matter addressed to the sound discretion of the trial judge, and especially is this true when the showing is based upon equitable and not statutory grounds; and the whole record must be looked to, to ascertain whether the court erred.

**3.—Same—Case Stated—Want of Diligence.**

Where defendant's counsel claimed that they were informed for the first time two days before the trial that defendant was suffering from delusions and was insane on the question of the chastity of his wife, and therefore, asked for a postponement or continuance of the case, but it was shown that counsel had ample opportunity to ascertain these facts long before the trial, there was no error in overruling the motion.

**4.—Same—Evidence—Insanity—Expert Witness—Defendants' Declarations.**

Where, upon trial of murder, the defendant introduced an expert witness who testified that he examined defendant two days before the trial and found that he was suffering from delusions and was insane on the question of the chastity of his wife, but was not wholly non compos mentis, there was no error in not admitting defendant's various statements and declarations made to the expert as proof of such delusions and as disclosing the basis upon which the expert predicated his opinion. Distinguishing Spivey v. State, 45 Texas Crim. Rep., 496, 77 S. W. Rep., 444.

**5.—Same—Evidence—Expert Testimony—Monomaniac.**

Where defendant's expert witness was permitted to testify that he had talked with defendant, examined him, how he appeared, and all other facts and circumstances except the actual unsworn statements of defendant, and with this as a basis, the expert was permitted to state that the defendant was a monomaniac, there was no error in excluding the detailed statements of the defendant of past events made to said expert.

**6.—Same—Insanity—Charge of Court—Time of Trial.**

Where, upon trial of murder, the issue of insanity at the time of the commission of the offense was interposed, upon which the court properly charged the jury, who found that defendant was not insane at the time of the commission of the offense, this necessarily included a finding that he was not insane at the time of the trial, as all the circumstances upon which it was sought to prove that fact occurred prior to the commission of the offense, and the expert based his opinion wholly upon those matters. Distinguishing Chase v. State, 41 Texas Crim. Rep., 560.

**7.—Same—Evidence.**

Where the question whether the witness and deceased did not drink together could not throw any light on the difficulty between defendant and deceased, there was no error in excluding this testimony.

**8.—Same—Evidence—Animus of Defendant.**

Where, upon trial of murder, it was shown that the defendant knew that the deceased was going to a certain place where he was killed and why he was going there, there was no error in admitting this testimony.

**9.—Same—Evidence—Proof of Insanity—Non-Expert Opinion.**

Where, the state's witness testified that he had known defendant from five to seven years and lived in about three and one-half miles in the country from him; had seen him often and frequently; talked with him on various matters, etc.; there was no error in permitting the witness to express his opinion as to the sanity of defendant.

**10.—Same—Evidence—Declarations by Defendant.**

Where declarations of the defendant made while he was under arrest were admitted without objection and thereupon excluded as soon as the court's attention was directed thereto, there was no reversible error.

**11.—Same—Evidence—Jailer—Non-Expert Opinion.**

Upon trial of murder, there was no error in permitting the jailer to testify that he saw defendant every day while in jail; observed him and talked with him occasionally, and that in his opinion, defendant was sane: the witness not being permitted to state anything defendant said. Following Burt v. State, 38 Texas Crim. Rep., 397, and other cases. ·

**12.—Same—Argument of Counsel—Bill of Exceptions.**

Where the record did not show that the remarks objected to were made by State's counsel or that any bill of exceptions was reserved thereto, there was no error.

**13.—Same—Insanity—Charge of Court—Irresistible Impulse.**

Where, upon trial of murder, defendant pleaded insanity and the charge of the court upon this question followed approved precedent, there was no error, and the doctrine of irresistible impulse with reference to the plea of insanity has never been recognized in this state. Following Hurst v. State, 40 Texas Crim. Rep., 378.

**14.—Same—Charge of Court—Reasonable Doubt—Preponderance of Evidence.**

It has always been held by this court that it is proper to charge the jury that the defendant is not required to establish his plea of insanity beyond a reasonable doubt, but only to the satisfaction of the jury by a preponderance of · the evidence. Following Giebel v. State, 28 Texas Crim. App., 151, and other cases.

**15.—Same—Charge of Court—Reasonable Doubt.**

Where the court properly submitted the reasonable doubt between the degrees of murder, there was no error in failing to annex this to the paragraphs on murder in the first and second degrees.

**16.—Same—Insanity—Charge of Court.**

There are no degrees of insanity in the criminal law of Texas, and a person is entitled to an acquittal by reason of his insanity if he does not know the right or wrong of the act he is charged with, and where the court properly charged upon the issue of insanity, there was no error.

**17.—Same—Charge of Court—Manslaughter—Self-Defense.**

Where, upon trial of murder, there was no evidence raising the issues of self-defense or manslaughter, there was no error in the court's failure to charge thereon.

Appeal from the District Court of Ellis. Tried below before the Hon. F. L. Hawkins.

Appeal from a conviction of murder in the first degree; penalty, confinement in the penitentiary for life.

The opinion states the case.

*John H. Sharp* and *Farrar & McRae,* for appellant.—On question that the court erred in excluding the statements of defendant made to the expert witness: Spivey v. State, 45 Texas Crim. Rep., 496, 77 S. W. Rep., 444; People v. Nino, 149 N. Y., 317; People v. Shattuck, 109 Cal., 673; Com. v. Johnson, 188 Mass., 382; People v. Warthington, 105 Cal., 166; Underhill on Criminal Evidence, p. 315; 7 Ency. of Ev., p. 447.

On question of court's refusal to submit special charge to acquit

if the jury believed the defendant insane at the time of the trial: Chase v. State, 55 S. W. Rep., 833.

On question of cross-examination of defendant's wife: Stewart v. State, 52 Texas Crim. Rep., 273; Jones v. State, 38 id., 87; Richards v. State, 55 id., 278; Hobbs v. State, 53 id., 71; Jones v. State, 51 id., 472; Yeiral v. State, 56 Texas Crim. Rep., 267, 119 S. W. Rep., 848; Brock v. State, 71 S. W. Rep., 20.

On question of admitting nonexpert opinion of witness: Cox. v. State, 60 Texas Crim. Rep., 471, 132 S. W. Rep., 125; Wells v. State, 50 Texas Crim. Rep., 499, 98 S. W. Rep., 851; Williams v. State, 39 S. W. Rep., 687.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, Judge.—Appellant was indicted, tried and convicted of murder in the first degree, and his punishment assessed at imprisonment in the penitentiary for life.

According to the view we take of the evidence all the issues hang on one proposition: was the defendant insane at the time of the commission of the offense? That he killed Sam Wilson is proven beyond dispute, and the circumstances attending the killing are such that if appellant was sane, the jury were fully authorized to find the verdict they returned. Appellant's wife testified that she had separated from appellant and brought suit for divorce, the record showing that the suit for divorce was filed May 26, 1911, while appellant killed deceased on June 3, just eight days after the suit was brought, and right after the killing he met Banker Caldwell and asked him to go on his bond, saying "he would kill any G-d d-d s-n of a b-h that would cause him and his wife to separate." It was shown that appellant and deceased were seen to have a conversation about half an hour before the killing on the streets of Ennis, at which time the only remarks claimed to have been overheard was that appellant remarked to deceased, "You won't do that," and deceased laughingly replied, "No, I won't," and remarked to appellant he had better let his brothers-in-law, the Dodds, alone, or he might get in trouble. They separated, and in about half an hour appellant killed deceased as he started in the hardware store of J. D. King, three shots taking effect, one entering the right side between the fifth and sixth ribs, and coming out about two inches from the right nipple; the other the left side, and the other in the leg. The testimony would show that the two shots in the side entered from the rear, while the third which went in the leg, it is not shown whether it entered from the front or the rear.

On the question of defendant's plea of insanity, Mrs. Kirby testified that she and appellant were married in Tennessee, and about a year after they were married appellant became intensely jealous of his wife and his father and talked to his brother about it; that he was of

an intensely jealous disposition; that they subsequently moved to Texas, and he accused men of knocking on the house at night, and would go out and look for them. That she did not hear the knocking; that he locked her in a room one night and went to Mr. Brawthers to get some liniment to doctor a mare, but the mare was not sick; that his complaint of men knocking on the house had been going on for three or four years, sometimes complaining every two or three weeks, taking it by spells. He had accused his wife of going out, saying he saw the tracks; there were tracks there but they were not hers. At one time he sawed a hole in the middle room (the one they lived in) under the bed large enough for anyone to get through, giving no reason why he did so; for the last year or two he had burned a lamp all night, and accused her of one particular man coming to the house, and had thrown up other men to her; he was jealous of one hired hand, and a Bohemian, and other circumstances which at last caused their separation. The evidence would show Mrs. Kirby is a virtuous woman and all these suspicions were unfounded. On cross-examination she was asked if appellant was drinking when he made these accusations, and she said sometimes and at other times not; that he only seemed like he was mad. In answer to the question: "You thought he appeared to be mad and mean," she answered, "He appeared to be mad—I don't know whether he was mean or not, must have been mean or something." That appellant treated her nice in other ways, except being jealous and accusing her of other men. That he never accused her of having anything to do with deceased, and had never mentioned his name to her out of the way. That the last time he had said anything to her about men having improper relations with her was a year or more before the killing. Appellant objected to the witness being asked if appellant was mad and mean, on the ground that it was cross-examining of the wife on something not brought out on direct examination. Appellant had brought out these circumstances as bearing on the condition of appellant's mind, and it was permissible as throwing light on that inquiry.

Julius Dodd testified he was a brother-in-law of defendant, and on several occasions in the last four or five years had said his sister (wife of appellant) was not living right, and this spring before the killing appellant had come to him and demanded money that had been placed to the credit of witness; said women could make money "whoring around." He claimed that this money had been placed to witness' credit and had been made dishonestly, and demanded it. No exact amount was named. Witness said no money had been placed to his credit by anyone, and when he asked appellant what he meant, appellant had replied, "You know what I mean—a man can go on, make out like he don't know the meaning of a thing and at the same time understand it all." That appellant seemed to be mad. He went on and said that money could be made by women and had been made that way and put to men's credit. That he never named anyone as

the person guilty of the acts or placing the money in the bank. Had the witness been permitted he would have stated he inferred that appellant was talking about his sister (the wife of appellant). Appellant excepted to the court refusing to permit him to prove that by the witness, but it was proper to permit the witness to state all that occurred and leave it to the jury to draw inferences. The witness on cross-examination stated that appellant appeared to be perfectly sane at the time. That he had known appellant for eleven years intimately; had lived in the house with him for one year, and at this and no other time did appellant appear to be crazy or of unsound mind.

With this testimony as a basis appellant proved by Dr. West that on Saturday before the case was called for trial on Monday, at request of appellant's counsel he had visited appellant in jail, without disclosing his purpose, and spent two hours with him. After qualifying himself as an expert, he said defendant detailed pretty thoroughly and extensively the circumstances and various things leading up to the murder, beginning back at his home on the farm, and the various happenings around his home. "I had defendant to detail pretty thoroughly various facts, what he had been doing, etc., previous to the murder and up on down until the act occurred, around and at his home and in Ennis. During the time he was making this statement I observed his manner and I noticed that he was restless and nervous, rather agitated and excited during the time he was talking over it.

"To sum up, after I had made this examination of him and had gained all the information I could concerning him, in my opinion defendant is insane on the point connected with the deceased, connecting him up with his wife and various happenings around his home, and so on.

"A great many men are insane on only one subject, called monomaniacs; the great majority of men are insane on only one subject. They could make a good horse trade and are all right on all subjects except on one subject. I have seen a number of cases of that character. You could not tell they were crazy at all on ordinary subjects, but just strike the point that they were 'off' on and they were all wrong, wild.

"If a person believed, without foundation, in fact, for the belief, that he heard knockings on the wall of his house at night, people snapping pistols around his residence, falsely believe that his wife was holding illicit relations with other men, including the father of the person, believes his wife made money in an illicit way and turned it over to her brother, and with the understanding that there was absolutely no foundation in fact for any of that belief, and for the belief that he heard voices also around the house at night, it would indicate an insane mind on those subjects.

"The fact that he was sane on all other subjects, had sound judgment, could make trades, deal intelligently in matters of commerce

and things of that kind, would not detract from the fact that he was insane on those other particular subjects.  One might be perfectly rational, able to make good trades, attend to business and pass with the general public as though perfectly rational, and on some one point be altogether wrong.

"The authorities I mentioned do not treat of insanity only but various nervous diseases.  If I understand the definition 'legal insanity' is that if a man knew whether the thing was right or wrong, if he knew whether it was right or wrong he was pronounced a sane man.

"In using the term as I have used it I had reference to medical insanity, with mind unbalanced so that he would not act rationally. I could not say with reference to defendant about legal insanity."

The State proved in rebuttal by A. N. Skinner: "I have been in the grocery business at Ennis eleven years.  I know John Kirby; have known him five or six years.  He has bought goods from me every year.  Nearly every week in the year he sold me his butter and eggs, came to town with it nearly every week, and I sold him groceries.  We talked about farming and everything else in general to be talked about.  From my conversation with him and observations of him during those times I regarded him as sane."  And J. D. Parker, R. J. Caldwell, R. O'Bannion, Perry Dodd, Pete Freeman, Dr. W. A. Campbell, Tom Stringer, J. O. Hinton, Lee Miller, J. M. Maggart, A. D. Gerrin, C. W. Phelps, Ed. Wakeland, Fred Genthner, and Morton Simmons, each and all of them, testified to more or less intimate association with appellant from three or four years prior to the killing, up to and including the time of the killing; some had business dealings with him, and others saw and came in contact with him under different circumstances, and each and every one of them testify that appellant was perfectly sane.  To none of them had he ever said a thing about improper conduct on the part of his wife.  In fact, this seems to have been to his wife and her brother alone, except the occasion when the doctor went to see him two days before his trial.

In this condition of the record, after giving the usual and customary charge on insanity, the court, at the request of appellant, gave the following special charge:

"Gentlemen of the Jury:  I further instruct you, in connection with my main charge, that monomania is a phase of insanity recognized by the law, that is, a person may be sane, upon all topics save one, but insane upon this one topic, and such insanity may operate as an excuse for the commission of an act that would otherwise be criminal, if the delusion be of such a character as to impair the mind of the one afflicted therewith, to such an extent that he did not know the nature, or quality of the act he was doing, or if he did know that he did not know he was doing wrong; and if you believe from a preponderance of the testimony before you that the defendant, at the time of the killing (if any) was suffering from such a delusion as to

impair his mind to the extent that he did not know the nature or quality of the act he was doing (if any), or if he did know that he was doing wrong, then you will acquit the defendant upon the ground of insanity and let your verdict read as suggested in my main charge."

This sufficiently presents the case that we may take up and discuss each of the grounds of the motion for new trial. In bill of exceptions No. 1 it is urged that the court erred in overruling the application for a continuance. It is not claimed that any legal showing was made, but appellant's counsel claim that as they were informed for the first time by Dr. West, on Saturday before the case was called for trial on Monday, that appellant was suffering from delusions and was insane on the question of chastity of his wife, they should be granted time in which to make investigation and secure testimony as bearing on this issue if possible. The record shows that appellant had been in jail from about June 3 until November 13 in the town where his counsel resided, and if in their necessary association and consultation with him appellant had not so spoken or conducted himself as to raise this issue in their minds until two days before the case was set for trial, it is strongly persuasive to one that appellant is sane on all matters, unless it be the one the doctor testifies in regard to. A continuance is a matter addressed to the sound discretion of the trial judge, and especially is this true when the showing is based upon equitable and not statutory grounds, and in deciding whether or not the court abused his discretion, we must look to the whole record on appeal, and in doing so, we can not conclude that the court erred in this matter.

The next bill complains that after Dr. West testified as above detailed, the defendant offered to prove the various statements and declarations made to the doctor as proof of the delusions entertained and as disclosing the basis upon which the doctor predicated his opinion. The State objected on the ground that such statements would be but self-serving declarations and the doctor would be but repeating statements of appellant not made under oath, and getting before the jury his reasons and justification for the offense. The court sustained the objections, but permitted the doctor to testify as hereinbefore set out. Appellant cites us to the case of Spivey v. State, 45 Texas Crim. Rep., 496, 77 S. W. Rep., 444. We have carefully read that case but we do not think it sustains his contention. In this case the doctor was testifying as an expert and not from what he knew of his own knowledge only in so far as he gathered by two hours investigation a day or two before, and he does not make appellant an insane person to the extent that he did not know right from wrong in the general affairs of life, but that he had delusions and was insane on the point of the conduct of his wife and relations with men. If a person was wholly non compos mentis, there might not be that objection to his statements that there would be to a person who is mentally unbalanced only about one thing, and yet at the same time wholly sane as to all other matters. From a careful reading of the evi-

dence sought to be introduced, we find that in the detailed recitals of acts and his reasons therefor, the doctor did not know of his own knowledge that these things had taken place. If a physician is permitted to detail the conversation of the person who is charged with crime, and who, as testified to in this case, if insane at all, is insane only on one certain delusion that has impressed itself on his mind, yet is normal in intellect in all the other affairs of life, most anyone could detail a series of events on which a physician could truthfully answer that one in such condition was mentally unbalanced. The bill does not show that it was expected or offered to be proved by any witness that the details thus recited were true or had happened, and if they had not occurred it would not be permissible for an expert to detail them as a basis for an opinion that one is insane. In testifying as an expert to whom hypothetical questions are propounded, the hypothesis must have some basis in the testimony. Some person must have so testified. The doctor was permitted to testify that he had talked with him, examined him, how he appeared, and all other facts and circumstances except the actual unsworn statements of appellant, and with this as a basis he was permitted to testify that appellant was insane— was a monomaniac. This was permitting him to go as far as he should in this character of case, in giving the basis for his opinion. If the opposite party desired to question this opinion so given, on cross-examination, the details might be gone into, but if the jury is to take the statements as a basis by which they are to judge and determine whether or not one is insane, then some person who knows must testify to their occurrence. These statements were not sought that the doctor might base his opinion on the language used, or the manner of their utterances, but a detailed statement of past events was sought to be elicited and gotten before the jury. It was not sought to be proven so much that appellant was insane at the time he was examined, as by these statements to prove that he was insane in June prior to that time, and the doctor never having seen appellant until in November, of course, was testifying merely as an expert.

The next bill relates to the refusal of the court to instruct the jury that if they believed the defendant was *now insane* (that is, at the time of the trial) they would so return their verdict and inquire no further. In support of his contention appellant cites us to the case of Chase v. State, 41 Texas Crim. Rep., 560, but a careful reading of that case will demonstrate that it holds adversely to his contention. In that case a similar instruction was sought, but the court held that inasmuch as the evidence indicated that defendant in that case was as much insane at the time of the commission of the offense as at the time of the trial, and the court had instructed the jury that if defendant was insane at the time of the commission of the offense to acquit, there was no error. In this case the only evidence as to appellant's insanity at the time of this trial is the testimony of Dr. West, and he testified that he thought appellant was insane now on that point tes-

tified in regard to as he was at the time of the commission of the offense, only that he probably was more violent at the time the offense was committed, and the court instructed the jury that if they found appellant was insane at the time of the commission of the offense to acquit him. They finding 'him not insane at the time of the commission of the offense necessarily included a finding that he was not insane at the time of the trial, as all the circumstances upon which it was sought to prove that fact occurred prior to the commission of the offense, and the physician bases his opinion wholly upon those matters.

After the witness Beauchamp had testified that he and deceased were as friendly as they could be, he was asked if he and deceased did not drink together. The court sustained the objection to this question, and in this there was no error, as it in no sense could throw any light on the difficulty, it not even being claimed that deceased was drinking on the day he was killed.

Neither was there error in permitting the witness King to state that deceased had ordered a piece of machinery that came in that day. The evidence discloses that deceased had stated to appellant that morning he had ordered the machinery and must go and see about it. They parted, and when deceased went to go in this store, appellant fired on him from within this store. Knowledge that deceased was going to this store and why he was going there being traced to appellant, there was no error in admitting it, for if appellant fired on him as he started in this store it would be a circumstance going to show a preexisting determination to kill.

Appellant objected to the witness Stringer being permitted to testify that appellant was sane, on the ground that no sufficient predicate had been laid. The witness had testified "that he had known appellant from five to seven years, and lived in about three and one-half miles from him. That he had seen him often; had been by his place time and time again, and had talked with him around the place; talked about crops and first one thing and another; talked about stock and other things like men would do; about renting a place," etc. This was a sufficient showing of familiarity with appellant to entitle him to express his opinion as to the sanity of appellant (Jordan v. State, 60 Texas Crim. Rep., 178, 141 S. W. Rep., 786, and cases there cited). This ruling also applies to the testimony of the witnesses Mays, Miller, Phelps and Genthner.

It appears that Gerrin testified that he met appellant just before the homicide, and had a conversation with him in which appellant told witness he wanted to employ him to work in his crop, look after his stock, etc. Appellant wanted him to move out there, and he told appellant he would have to see his wife. He went to see her, and when he came back appellant again talked to him about working the crop, and still desired him to move out there. It appears the killing took place while the witness had gone to see his wife, and it subse-

quently developed that this statement about appellant still desiring him to go on out there and work the crop, after the killing, occurred while appellant was under arrest, and appellant moved to exclude that portion of the statement, which motion was sustained by the court and the jury instructed not to consider it. As the statement went in without objection and the court excluded it as soon as he was requested to do so, this presents no error.

The only other bill of exceptions in the record relates to the testimony of the witness Maggart, who testified that he was jailer and had been since the third day of June when appellant was incarcerated therein. That he saw appellant every day; observed him and talked to him occasionally, and that in his opinion appellant was sane. The witness was not permitted to state anything that appellant said, but only that he had talked with him, as a means of showing his source of information. Appellant objected on the ground that appellant was in jail at the time this witness made these observations, and had these conversations, etc. This question has been decided adversely to appellant's contention. (Burt v. State, 38 Texas Crim. Rep., 397; Cannon v. State, 41 Texas Crim. Rep., 467; Adams v. State, 34 Texas Crim. Rep., 470; Lane v. State, 59 Texas Crim. Rep., 595, 129 S. W. Rep., 353.)

There is no bill of exceptions showing that Mr. Whipple of counsel for the State, used the remarks alleged in the motion for a new trial, nor that it was excepted to at the time if he did do so, consequently this presented no error, and the same may be said as to the remarks of the county attorney complained of in the motion for new trial.

The remaining paragraphs of the motion for a new trial complain of the charge of the court. The charge as drawn has been so frequently approved by this court we hardly deem it necessary to discuss the various assignments. The doctrine of "irresistible impulse" has never been recognized in this State. In Cannon v. State, 41 Texas Crim. Rep., 489, this court held that if defendant has an irresistible impulse to commit a crime, and does not know the nature and quality of the act, he is insane, and is guilty of no offense; if he does know the nature and quality of the act, and does know right from wrong, and knows the act to be wrong, he is not insane and is responsible for his act. Insanity is an absolute justification and can not be used as an extenuating circumstance. In the case of Hurst v. State, 40 Texas Crim. Rep., 378, it was held by a majority of the court that the doctrine of irresistible impulse had no place in a case where insanity is the defense, and the court should not charge thereon, and that doctrine has been upheld in an unbroken line of decisions since that time. And it has always been held by this court that it was proper to charge the jury that the defendant is not required to establish his plea of insanity beyond a reasonable doubt, but only to the satisfaction of the jury by a preponderance of the evidence. Giebel v. State, 28 Texas

Crim. App., 151, and cases cited in Hurst v. State, 40 Texas Crim. Rep., 379.

The court charged the jury that if they had a reasonable doubt as to whether defendant was guilty of murder in the first degree, they must give the defendant the benefit of such doubt, and not find him guilty of a higher grade of offense than murder in the second degree, and if they had a reasonable doubt as to his guilt they would acquit, and it was not necessary to annex this to the paragraphs on murder in the first and second degree.

.The remainder of the charge is drawn in accordance with the approved precedents in this court, and because there was evidence that raised the issue of insanity, which being properly submitted, did not alter the law as applicable to the case if the jury found he was insane. We have no degrees of insanity in the criminal law, and a person is entitled to be acquitted by reason of his insanity if he does not know the right or wrong of the act he is charged with; if he has sufficient mind to know and appreciate the fact that the act is wrong, he is held responsible for the act he commits, and the law is or should be measured out to each individual alike.

There was no evidence raising the issues of self-defense or manslaughter, and the court did not err in failing to charge thereon, nor in refusing the special charges requested. · The other special charges were fully covered by the court's main charge and the special charge given at the request of appellant in so far as they were applicable to the case. If appellant was sane he was guilty of murder in the first degree under the evidence. The 'jury found he was sane, for in addition to the special charge given by request hereinbefore copied, the court instructed the jury:

"You are charged that only a person with a sound memory and discretion can be held punishable for a crime, and that no act done in a state of insanity can be held punishable as an. offense. Every man is presumed to be sane until the contrary appears to the jury trying him. He is presumed to entertain, until this appears, a sufficient degree of reason to be responsible for his acts; and to establish a defense on the ground of insanity it must be clearly proved that at the time of committing the act, the party accused was laboring under such defect of reason, from disease of mind, as not to know the nature or quality of the act he was doing; or if he did know that, he did not know he was doing wrong, that is, that he did not know the difference between the right and wrong as to the particular act charged against him, which in this case is the unlawful killing of Sam Wilson. The insanity must have existed at the very time of the commission of the offense, and the mind must have been so dethroned of reason as to deprive the person accused of a knowledge of the right and wrong as to the particular act done."

"If you find from the evidence that defendant killed Sam Wilson, but if defendant has satisfied you by a preponderance of the evidence

that at the very time he did so he was insane, as explained to you in paragraph fourteen of this charge, then you will acquit the defendant on the ground of insanity; and if you should acquit him on such ground the form of your verdict may be, 'we, the jury, find the defendant not guilty on the ground of insanity.' "

These paragraphs and the special charge given presented every theory of defense raised by the evidence, and as the verdict found this defense untrue, the judgment must be affirmed.

*Affirmed.*

Davidson, Presiding Judge, not sitting.
[Rehearing denied October 3, 1912.—Reporter.]